IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

COMPANY DOE,

    Plaintiff,

    v.

INEZ TENENBAUM *et al.*,

    Defendants.

Civil Action No. 8:11-cv-02958-AW

---

## REVISED MEMORANDUM OPINION

Plaintiff Company Doe initiates this action against the following Defendants: (1) Inez Tenenbaum, in her official capacity as Chairwoman of the Consumer Product Safety Commission; and (2) the Consumer Product Safety Commission. Plaintiff asserts four related claims under the Administrative Procedure Act ("APA"). Concerning its APA claims, Plaintiff contends that the Commission's decision to publish a report implicating Plaintiff's product in ▓▓ �reports▓▓ is arbitrary and capricious, an abuse of discretion, in excess of its statutory authority, and otherwise not in accordance with the law. *See* 5 U.S.C. § 706(2). Plaintiff also asserts a Fifth Amendment claim predicated on purported due process and takings violations. In addition to an exhaustive review of the record, the Court held a motions hearing on February 1, 2012. The Parties have fully briefed the outstanding motions and the Court deems any further hearings unnecessary. For the reasons articulated herein, the Court issues the ensuing rulings: (1) the Court **GRANTS IN PART** Plaintiff's Motion to Seal; (2) **DENIES AS MOOT** Plaintiff's Motion for Preliminary Injunction; (3) **GRANTS**, nunc pro tunc, Plaintiff's Motion for Oral Argument; (4) **DENIES** the Consumer Groups' Motion to Unseal Filings; (5) **DENIES**

1

Case 8:11-cv-02958-AW Document 69 *SEALED* (Court only) Filed 10/09/12 Page 2 of 73

the Commission's Motion for Summary Judgment; and (6) **GRANTS** Plaintiff's Cross-Motion

for Summary Judgment.

## I.    FACTUAL AND PROCEDURAL BACKGROUND



████████████████████████ Plaintiff manufactures a consumer product known as

████████████████████ Plaintiff describes ████████████████ as

████████████████████████ Pl.'s Mem. Supp. Mot. Prelim. Inj. 2, Doc. No. 9-

1. The Court herein refers to ██████████████████ in general terms (e.g., ████████

████████████ ).

Defendant Inez Tenenbaum is Chairwoman of the Consumer Product Safety

Commission. Defendant Consumer Product Safety Commission is an independent federal

regulatory agency responsible for enforcing the Consumer Product Safety Act, 15 U.S.C.A §§

2051 *et seq.* (West 2009). As Plaintiff has sued Defendant Tenenbaum in her official capacity,

the Court refers to Tenenbaum and the Consumer Product Safety Commission collectively as

"the Commission."

In August 2008, Congress passed the Consumer Product Safety Improvement Act of

2008 ("CPSIA"), Pub. L. No. 110-314, 122 Stat. 3016 (2008) (codified in scattered sections of

15 U.S.C.A.). According to its preamble, in passing the CPSIA, Congress sought to "establish

consumer product safety standards and other safety requirements for children's products and to

reauthorize and modernize the Consumer Product Safety Commission." CPSIA, 122 Stat. at

3016. Section 212 of the CPSIA establishes a consumer product safety database. 15 U.S.C.A. §

2055a (West 2009). Specifically, § 212 requires the Commission to "establish and maintain a

database on the safety of consumer products, that is—(A) publicly available; (B) searchable; and

(C) accessible through the Internet website of the Commission." *Id.* § 2055a(a)(1). In relevant

part, the database must include "[r]eports of harm **relating to** the use of consumer products . . .

that are received from . . . local . . . government agencies." *Id.* § 2055a(b)(1) (emphasis added).

The Commission launched the database on March 11, 2011. *See SaferProducts.gov*, CPSC.gov,

http://www.saferproducts.gov (last visited June 17, 2012).

    The Parties' dispute traces to the Commission's planned publication of a report about the

███████████████████████████ On ██████████████, an unidentified local

government agency submitted an incident report to the Commission. AR000009–11. The report

reads as follows:



AR000009.

    On ████████████, Plaintiff argued in a letter that the report was "materially inaccurate"

within the meaning of the CPSIA and demanded that the Commission refrain from publishing it.

AR000030–33. Plaintiff so argued pursuant to CPSIA provisions empowering manufacturers to

contest the publication of reports on the ground that they contain materially inaccurate

information. *See* 15 U.S.C.A. § 2055(c) (West 2009). Plaintiff maintained that the report

contained confusing and contradictory statements. For instance, the report states that ███████

3

████████████████████████████████

████████████████████████████████████████

████████████ *See* AR000009.

In the following days, Plaintiff submitted medical evidence to the Commission to buttress
its contention that the report was materially inaccurate. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████

████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

*Id.*

Additionally, ████████████████████████████████ and presented
his findings in a report to the Commission. AR000069–72. ████████████████

████████████████████████████████████████

████████████ Pl.'s Mem. Supp. Mot. Prelim. Inj. 9, Doc. No. 9-1. ████████

████████████████████████████████████████

████████████████████████████████████



On ███████, Dr. ████████ reviewed the report of harm to determine
whether it described a risk of harm related to ██████████████ AR000046. Dr.
████ is an engineering psychologist for the Commission. Dr. ████ concluded that the
report described ████████████████████████ *See id.*
Regarding the risk of harm the report purports to describe, Dr. ████ reasoned:

*Id.* Further attempting to associate the risk of harm to ████████████ Dr. ████
continued:



*Id.* In a declaration prepared after the commencement of the litigation, J. DeWane Ray, Assistant

Executive Director of the Office of Hazard Identification and Reduction at the Commission,

states that he agrees with Dr. ████'s assessment. AR0000195.

On ██████████, the Commission notified Plaintiff that the information in the

incident report that Plaintiff identified as materially inaccurate met the definition of materially

inaccurate information in 16 C.F.R. § 1101.26 (2011). AR000078. In a bid to rid the report of the

material inaccuracy, the Commission thus redacted it:



*Id.*

The day after, Plaintiff filed another material inaccuracy claim. AR00082–84. Plaintiff

argued, inter alia, that the second report compounded the first report's inaccuracy by suggesting

a relationship between a █████████████████████████████ and the

███████████████ To buttress its argument, Plaintiff highlighted ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

On ███████ or thereabouts, the Commission notified Plaintiff that the information in the report's second version was materially inaccurate. AR000090. For the second time, the Commission tried to purge the report of its material inaccuracy, producing a third iteration:



*Id.*

On the same day, Plaintiff lodged a Complaint in this Court. Compl., Doc. No. 1. Contemporaneously, Plaintiff filed a Motion for Leave to Seal Case and to Proceed Under a Pseudonym ("Motion to Seal"). Pl.'s Mot. Seal, Doc. No. 2. In its Motion to Seal, Plaintiff requests the Court to enter an order "requiring all pleadings, documents, and forms to be filed under seal" and "allowing it to proceed under the pseudonym Company Doe." *Id.* at 1.

Plaintiff's Complaint seeks to enjoin the Commission from publishing the third incident report. Plaintiff impugns the third report as baseless and inflammatory and contended that its publication, besides being unlawful, would cause irreparable harm to its reputation and financial well-being.

7

The Complaint contains four counts. Count I is for abuse of discretion. That is, Plaintiff alleges that the Commission abused its discretion by deciding to publish the third report and, as a result, ran afoul of the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 706(2)(A). Count II avers that the Commission's decision to publish the report constitutes arbitrary and capricious conduct in contravention of 5 U.S.C. § 706(2)(A). Count III, for its part, contends that the Commission's actions exceeded its statutory authority in transgression of 5 U.S.C. § 706(2)(C). Lastly, Count IV asserts a two-prong Fifth Amendment claim. The first prong alleges a due process violation. The second prong posits a violation of the Takings Clause. In its prayer for relief, among other things, Plaintiff asks the Court to issue a preliminary injunction enjoining publication of the report.

Consistent with its prayer, on October 21, 2011, Plaintiff filed a Motion for Preliminary Injunctive Relief ("Motion for Preliminary Injunction"). *See* Pl.'s Mot. Prelim. Inj., Doc. No. 9. Plaintiff makes numerous arguments in its Motion for Preliminary Injunction, of which a triumvirate is salient: (1) the Commission's publication of the report would amount to arbitrary and capricious conduct; (2) the Commission's publication of the report would be an abuse of discretion; and (3) Plaintiff has otherwise satisfied the prerequisites for a preliminary injunction.

The Commission filed a Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction ("Opposition to Motion for Preliminary Injunction") on November 4, 2011. Def.'s Mem. Opp'n Pl.'s Mot. Prelim. Inj., Doc. No. 16. The Commission allots substantial space in its Opposition to Motion for Preliminary Injunction to the argument that its construction of the CPSIA merits deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Moreover, in passing, the Commission intimates that its decision to publish the report is not "final agency action" under the APA.

On November 20, 2011, Plaintiff filed an Unopposed Motion Requesting Oral Argument on Plaintiff's Motion for Preliminary Relief ("Motion for Oral Argument"). Mot. Oral Arg., Doc. No. 20. The Court scheduled an oral argument for February 1, 2012, on which date both Parties appeared and presented their positions before the Court. The Court grants this Motion nunc pro tunc. In the interest of clarity, the Court defers discussing the Parties' oral argument until it has discussed other procedural aspects of the case.

Originally, Plaintiff filed the entire case under seal, including its Motion to Seal and accompanying memorandum in support. Consequently, the following consumer groups could not access those documents: Public Citizen, Consumer Federation of America, and Consumers Union (collectively "Consumer Groups"). Evidently, the Consumer Groups complained to the Clerk of the Court that Plaintiff's sealing of its Motion to Seal and accompanying memorandum in support violated Rule 105.11 of the Local Rules for the United States District Court for the District of Maryland. Concerning motions to seal, Local Rule 105.11 pertinently provides that "[t]he Court will not rule upon the motion until at least fourteen (14) days after it is entered on the public docket to permit the filing of objections by interested parties." Local Rule 105.11 (D. Md. 2011).

After lodging this informal complaint—but, interestingly, before the public docket was unsealed—the Consumer Groups filed an Objection Under Local Rule 105(11) to Plaintiff's Motion to Seal ("Objection to Motion to Seal" or "Objection"). Object. Mot. Seal, Doc. No. 14. The Consumer Groups object to Plaintiff's Motion to Seal on the basis that it is overbroad, contravenes Fourth Circuit precedent, and restricts the public's access to information concerning the safety, or lack thereof, of consumer products. In terms of substance, many of the arguments that the Consumer Groups make in their Objection to Motion to Seal duplicate arguments that

the Commission makes in its Opposition to Plaintiff's Motion to Seal. *See* Def.'s Opp'n Mot. Seal, Doc. No. 11.

On November 8, 2011, roughly a week after the Consumer Groups filed their Objection to Motion to Seal, the Parties filed a Joint Motion to Unseal Plaintiff's Motion to Seal ("Joint Motion to Unseal"), Doc. No. 18. Plaintiff explained therein that, although it "requested a seal of the entire case, it was not [its] intention to submit the motion to seal or memorandum in support under seal." Joint Mot. Unseal 1, Doc. No. 18. Pursuant to the Parties' agreement, the Court issued an Order toward the tail end of November granting their Joint Motion to Unseal. Doc. No. 21. As a result, Plaintiff's Motion to Seal and the accompanying memorandum in support— neither of which reveals sensitive information—appear on the public docket. Apparently, these are the only documents available on the public docket.

On December 6, 2011, the Consumer Groups filed a Motion to Unseal Filings Regarding Plaintiff's Motion to Seal ("Motion to Unseal Filings"). Mot. Unseal Filings Re. Mot. Seal, Doc. No. 22. In this short Motion, the Consumer Groups ask the Court to unseal memoranda and other documents related to Plaintiff's Motion to Seal (e.g., the Commission's response in opposition to Plaintiff's Motion to Seal). The Consumer Groups did not offer much of a rationale for their request. *See generally id.*

In a curious twist, on December 16, 2011, the Commission filed a Motion to Dismiss. Def.'s Mot. Dismiss, Doc. No. 26. In its Motion to Dismiss, the Commission fleshes out the argument that it flirted with in its Opposition to Motion for Preliminary Injunction: that its decision to publish the report does not constitute final agency action under the APA. This grew into the Commission's lead argument as the case progressed.

In a similarly strange turn, Plaintiff filed a Motion to Stay on January 6, 2012. Pl.'s Mot.

Stay, Doc. No. 32. In its Motion to Stay, Plaintiff argues that evidence that the Commission

disclosed to it during the pendency of the case irrefutably establishes that ███████████

█████ It turns out that the Commission commenced an investigation into ███████████ around

the time it decided to publish the third incident report. At that time, Plaintiff apparently lacked

awareness that the Commission had undertaken said investigation. In the course of its

investigation, the Commission compiled an epidemiologic investigation report that includes

records that the ██████████████████████████ produced in connection with

████████████ *See* AR000119 (first page of report). Plaintiff posits that these records

positively prove that ████████████████ To support this conclusion, Plaintiff points to █

████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

AR000131.

Likewise, Plaintiff adduced a second declaration from ██████████ AR000240–42. In his

second declaration, ██████████ summarizes the content of the ████████ records. He writes:

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



Based on these developments, Plaintiff filed a fourth material inaccuracy claim on

January 5, 2012. AR000198–203. The gravamen of the fourth material inaccuracy claim is that

the epidemiologic report categorically confutes the notion that ███████████████████

██████████

---

[1] In its Motion to Stay, Plaintiff also argues that the epidemiologic report shows that the incident report
whose publication the Commission contemplates incorrectly identifies Plaintiff's product. Plaintiff has
abandoned this argument in the face of photographic evidence showing that ████████████████
████████████████ AR000248–52.

On January 11, 2012, Dr. ███ completed a second "risk of harm" assessment in light

of Plaintiff's most recent material inaccuracy claim. AR000244. In his assessment, Dr. ████

states that he agrees █████ that the ████████████ "was the

injury mechanism." *Id.*[2] Dr. ████ adds, however, that he "cannot agree that this means the

███ was <u>not associated</u> ███████" *Id.* He reasons:



███████████████████████████████████████████

*Id.* In a supplemental declaration, Mr. Ray states that he agrees with Dr. ████'s determination

that the report of harm relates to ███████████ AR000280–81. Mr. Ray stresses,

---

[2] Contrary to the conclusion of its own expert, the Commission disputes that the evidence establishes that
the ███████ Yet, as the ensuing exposition elucidates, this factual dispute lacks
genuineness. Furthermore, the Court would appropriately dispose of the case on summary judgment even
if, as a general matter, the dispute were genuine. *See, e.g., Rempfer v. Sharfstein,* 583 F.3d 860, 865 (D.C.
Cir. 2009) (second alteration in original) (quoting *Am. Bioscience, Inc. v. Thompson,* 269 F.3d 1077, 1083
(D.C. Cir. 2001)) ("[W]hen a party seeks review of agency action under the APA [before a district court],
the district judge sits as an appellate tribunal."). *Accord, e.g., James Madison Ltd. by Hecht v. Ludwig,* 82
F.3d 1085, 1096 (D.C. Cir. 1996); *Hosp. of Univ. of Penn. v. Sebelius,* 634 F. Supp.2d 9, 12–13 (D.D.C.
2009) (citing cases).

Case 8:11-cv-02958-AW   Document 69 *SEALED* (Court only)   Filed 10/09/12   Page 14 of 73

however, that he disagrees with Dr. ███'s conclusion that the ██████████ ████████ AR000281. Mr. Ray fails to explain why he disagrees with only this aspect of Dr. ███'s analysis.

One week later, the Commission partially approved Plaintiff's fourth material inaccuracy claim. AR000255. In its approval email, the Commission wrote that "[t]o correct this material inaccuracy, the CPSC is redacting from the incident description, product description, and brand the word ██████ Otherwise, the Report meets the criteria for publication . . . ." As a result, the report's fourth variant reads:



*Id.*

On ████████, Plaintiff filed a fifth material inaccuracy claim. AR000264–68. Paralleling its previous submissions, Plaintiff insisted that the report's fourth variant illogically linked ██████████████.

Two days later, the Commission rejected Plaintiff's fifth material inaccuracy claim. AR000276. Unlike its previous four responses, the Commission purported to support its fifth ruling with a rationale: "The identified information was determined not to be materially inaccurate because you failed to meet your burden of proof that the information in the Report is materially inaccurate." AR000276. Plaintiff terms this rationale as a "tautology."

14

Case 8:11-cv-02958-AW   Document 69 *SEALED* (Court only)   Filed 10/09/12   Page 15 of
73

On January 27, 2012, Plaintiff moved to withdraw its Motion to Stay and simultaneously
filed an Unopposed Motion to File an Amended Complaint ("Motion to File Amended
Complaint"). Mot. File Am. Compl., Doc. No. 36. In this Motion, Plaintiff asserted that staying
the case served no point seeing that the Commission had shown no sign of backing down from
publishing the report. Instead, Plaintiff moved to amend its Complaint to include information
concerning the epidemiologic report and the events that transpired after its revelation. The Court
summarily granted this Motion. *See* Doc. No. 37.

Although the Amended Complaint's factual allegations differ somewhat from the
Complaint's, the former's claims duplicate the latter's. In brief, the Amended Complaint asserts
four related APA claims and a tagalong Fifth Amendment claim founded on alleged due process
and takings violations.

On the same day it granted the Motion, the Court heard oral arguments. Much of the oral
argument treaded territory that the Parties had already covered in their previous filings. The
Court need not discuss what little new ground the Parties covered as they fully discuss these
issues in subsequently filed memoranda.

On February 16, 2012, the Court conducted a telephonic status conference with the
Parties. During this conference, counsel for the Commission expressed his desire to file a motion
to dismiss or, alternatively, for summary judgment vis-à-vis Plaintiff's Amended Complaint. The
Commission further stated that it had yet to compile a complete administrative record, but that it
would have such a record in place by way of filing said motion. *See* Oral Arg. Tr. 50:10–24,
Doc. No. 44 (Commission's concession that, as of the time of oral argument, an administrative
record had not "been gathered yet"). Although Plaintiff suggested that the Court should rule on
the outstanding Motion for Preliminary Injunction, the Court decided to permit the Commission

to file a motion for summary judgment in respect of Plaintiff's Amended Complaint, with the understanding that Plaintiff would file a cross-motion for summary judgment.

Pursuant to this decision, the Parties conferred and entered a Joint Stipulation as to Briefing Schedule ("Joint Stipulation"). Joint Stip., Doc. No. 43. Observing this schedule, the Commission filed a Motion to Dismiss Plaintiff's Amended Complaint or, in the Alternative, for Summary Judgment ("Motion for Summary Judgment"). *See* Def.'s Mem. Supp. Mot. Summ. J., Doc. No. 41-1. The Commission's Motion for Summary Judgment is a lengthy document whose arguments, for the most part, mirror those made in its original Motion to Dismiss. Responsively, Plaintiff filed a Cross-Motion for Summary Judgment on March 7, 2012. *See* Pl.'s Mem. Supp. Cross-Mot. Summ. J., Doc. No. 46. Plaintiff's Cross-Motion for Summary Judgment similarly rehashes arguments that Plaintiff has made in previous memoranda, incorporating many of them by reference. The Parties have completed briefing on these Motions and the case is ripe for resolution.

## II.   STANDARD OF REVIEW

### A.   APA

Section 706(2) of the APA empowers courts to "hold unlawful and set aside" agency action that courts determine to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2), (A). Courts' scope of review under this standard is narrow. *Judulang v. Holder*, 132 S. Ct. 476, 483 (2011) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). It is well-settled that "a court is not to substitute its judgment for that of the agency." *Id.* (quoting *State Farm*, 463 U.S. at 43).

Nevertheless, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking." *Id.* at 483–84. Therefore, courts must satisfy themselves that the agency has examined "the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm,* 463 U.S. at 43 (citation and internal quotation marks omitted). In reviewing the agency's explanation, courts must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (citations and internal quotation marks omitted).

The APA typically limits arbitrary-and-capricious review to the "full administrative record." *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420 (1971); *see also* 5 U.S.C. § 706 ("[T]he court shall review the whole record or those parts of it cited by a party . . . ."). In other words, "[t]he reviewing court must apply the 'appropriate APA standard of review . . . to the agency decision based on the record the agency presents to the reviewing court.'" *Dow AgroSciences LLC v. Nat. Marine Fisheries Serv.,* 821 F. Supp.2d 792, 798 (D. Md. 2011) (quoting *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44 (1985)). Therefore, "[b]ecause the Court's review is confined to the administrative record, 'no de novo proceeding may be held.'" *Id.* (quoting *United States v. Carlo Bianchi & Co.,* 373 U.S. 709, 715 (1963)). Nonetheless, "if an agency has not provided an explanation for its action sufficient to allow effective judicial review, the Court may 'obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary.'" *Id.* (quoting *Camp v. Pitts,* 411 U.S. 138, 142–43 (1973)); *see also, e.g., Am. Wildlands v. Kempthorne,* 530 F.3d 991, 1002 (D.C. Cir. 2008) (internal quotation marks omitted) (citing *Hecht,* 82 F.3d at 1095 ) (holding that supplementation of administrative record

is appropriate where "the district court need[s] to supplement the record with background information in order to determine whether the agency considered all of the relevant factors"); *Asarco, Inc. v. U.S. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980) (holding that district courts may go outside the administrative record to ascertain "whether the agency considered all the relevant factors or fully explicated its course of conduct or grounds of decision").

## B.     Motion to Dismiss Under Rule 12(b)(1)

To determine whether an agency's action receives judicial review under the APA's general review provisions, the contested action must qualify as final agency action. *See Flue-Cured Tobacco Coop. Stabilization Corp. v. U.S. EPA*, 313 F.3d 852, 857 (4th Cir. 2002). In other words, courts lack subject matter jurisdiction to resolve claims that plaintiffs assert under the APA's general review provisions where the agency action on which they base such claims lacks finality. *See id.*

"There are two critically different ways in which to present a motion to dismiss for lack of subject matter jurisdiction." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). "First, it may be contended that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based." *Id.* Where the defendant contends that the complaint fails to allege facts sufficient to establish subject matter jurisdiction, "all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Id.*[3] [4] "Second, it may be contended that the jurisdictional allegations of the complaint [are] not true." *Id.* In such cases, "the court is free to consider exhibits outside the pleadings to resolve factual disputes concerning jurisdiction." *Zander v. United States*, Civil Action No. 8:09-CV-02649-AW, 2012 WL 447392, at *4 (D.

---

[3] *See infra* Part II.C for a statement of the standard of review for Rule 12(b)(6) motions.
[4] This is essentially the case here. The Commission does not seriously dispute the jurisdictional allegations in the Amended Complaint.

Md. 2012) (internal quotation marks omitted) (citing *Smith Wash. Metro. Area Transit Auth.*, 290 F.3d 201, 205 (2002)).

C.      Motion to Dismiss Under Rule 12(b)(6)

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). In two recent cases, the U.S. Supreme Court has clarified the standard applicable to Rule 12(b)(6) motions. *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). These cases make clear that Rule 8 "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Twombly*, 550 U.S. at 556 n.3 (quoting Fed. R. Civ. P. 8(a)(2)). This showing must consist of at least "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

In deciding a motion to dismiss, the court should first review the complaint to determine which pleadings are entitled to the assumption of truth. *See Iqbal*, 129 S. Ct. at 1949–50. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950. In so doing, the court must construe all factual allegations in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999). The Court need not, however, accept unsupported legal allegations, *Revene v. Charles County Commissioners*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

D.    Summary Judgment

Summary judgment is appropriate only "if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Material disputes are those that "might affect the outcome of the suit under the governing law." *Id.*

Although the Court should believe the evidence of the nonmoving party and draw all justifiable inferences in his or her favor, the nonmoving party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." *See Beal v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Further, if a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). Finally, hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment. *See Greensboro Prof'l Firefighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

Case 8:11-cv-02958-AW   Document 69 *SEALED* (Court only)   Filed 10/09/12   Page 21 of 73

## III.   LEGAL ANALYSIS

### A.   Whether the Commission's Decision to Publish the Report Violates the APA

Plaintiff's core argument is that the Commission's decision to publish the report constitutes both arbitrary and capricious conduct and an abuse of discretion under the APA. Plaintiff buttresses its basic position with a battery of discrete arguments. Out of this diffusion of dialectics, two suppositions take center stage. One, Plaintiff maintains that publishing the report would violate the plain meaning of both the CPSIA and the Commission's concomitant regulations. Specifically, Plaintiff avers that publication of the report would run counter to statutory and regulatory requirements that reports of harm "relate to" the use of consumer products. Two, Plaintiff posits that the report's publication would constitute an abuse of discretion. Both of these arguments carry the day and dispose of the question whether publishing the report violates the APA. Additionally, Plaintiff insists that publication of the report would violate the CPSIA's prescription against materially inaccurate information. This argument is meritorious as well and serves as an independent basis on which to enjoin publication of the report.[5]

This case calls on the Court to decide whether to allow the Commission to publish the contested report on the publicly available database whose creation the CPSIA mandates. To recapitulate, the CPSIA requires the Commission to "establish and maintain a database on the safety of consumer products, that is—(A) publicly available; (B) searchable; and (C) accessible through the Internet website of the Commission." 15 U.S.C.A. § 2055a(a)(1), (A)-(C) (West 2009). The database must include "[r]eports of harm relating to the use of consumer products."

---

[5] Because of the Court's resolution of these arguments in Plaintiff's favor, the Court declines to consider the alternative grounds for relief that Plaintiff raises in the Amended Complaint: (1) action in excess of statutory authority in violation of 5 U.S.C. § 706(2)(C); (2) action not in accordance with law in violation of 5 U.S.C. § 706(2)(A); (3) violation of the Fifth Amendment's Due Process Clause; and (4) violation of the Fifth Amendment's Takings Clause.

*Id.* § 2055a(b)(1)(A) (emphasis added). The CPSIA also requires the Commission to establish

minimum requirements concerning the content of the reports it publishes on the database. *Id.* §

2055a(b)(2). One such requirement includes "a description of the harm **relating to** the use of the

consumer product." *Id.* § 2055a(b)(2)(B)(iii) (emphasis added).

   The CPSIA authorizes the Commission to issue regulations necessary for its

implementation. CPSIA § 3, 122 Stat. at 3017. Pursuantly, the Commission issued a final rule

establishing a "Publicly Available Consumer Product Safety Information Database" on

December 9, 2010. *See* Publicly Available Consumer Product Safety Information Database, 16

C.F.R § 1102.02 *et seq.* (2011). The implementing regulations define the "reports of harm"

whose publication the CPSIA mandates in a manner that mimics the enabling statutory provision.

*Compare* 15 U.S.C.A. § 2055a(b)(1)(A) (West 2009) (emphasis added) (requiring the database to

include "[r]eports of harm **relating to** the use of consumer products"), *with* 16 C.F.R. §

1102.6(b)(8) (2011) (emphasis added) (defining "report of harm" as "any information . . .

regarding [harm] . . . **relating to** the use of a consumer product").

   The Commission's regulations also specify the minimum content of reports of harm. 16

C.F.R. § 1102.10(d) (2011). Implementing CPSIA § 2055a(b)(2), the report of harm must

include a description of the harm. *Id.* § 1102.10(d)(3). Echoing the CPSIA, this regulation

dictates that the harm the report describes must be "**related to** use of the consumer product." *Id.*

   Thus, the crux of the matter is whether █████ that the incident report describes relates

to ████████████ This inquiry turns on the meaning of the phrase "relating to." It

is axiomatic that, when construing a statute, courts must start with the statute's plain language.

*See, e.g., Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685 (1985) (citations omitted). "A

fundamental canon of statutory construction is that, unless otherwise defined, words will be

interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979) (quoting *Burns v. Alcala*, 420 U.S. 575, 580–81 (1975)). Here, neither the CPSIA nor the concomitant regulations expressly defines "relating to." Therefore, as a starting point in the analysis, the Court analyzes the term's ordinary meaning.

This inquiry presents an initial impediment. "Relating to" is commonly used in two distinct parts of speech: (1) a preposition or (2) a verb. When used as a preposition, "relating to" generally means "about" or "concerning." *See, e.g.*, *Relating to Synonyms*, Thesaurus.com., http://thesaurus.com/browse/relating+to (last visited June 18, 2012). For instance, Justice O'Connor has written that "requiring that the woman be informed of the availability of information **relating to** fetal development . . . is a reasonable measure to ensure an informed choice." *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 883 (1992) (plurality opinion). Yet one can use the verb "relate" phrasally (i.e., with "to") and in gerund form (i.e., with the -ing ending), resulting in the phrase "relating to." So used, "relating to" ordinarily connotes an association or connection between two or more things. *See, e.g.*, *Relate*. Merriam Webster.com, http://www.merriam-webster.com/dictionary/relate (last visited June 18, 2012). For example, Justice Thomas has written that "I have repeatedly stated that the Eighth Amendment's prohibition on cruel and unusual punishment historically concerned only injuries **relating to** a criminal sentence." *Erickson v. Pardus*, 551 U.S. 89, 95 (2007) (Thomas, J., dissenting) (emphasis added) (citations omitted).

Substituting the common meanings of the preposition "relating to" and the phrasal verb "relate to" in the above-cited examples illustrates the linguistic distinction between these terms. For instance, it would have been awkward had Justice O'Connor written that "requiring that the woman be informed of the availability of information [connected with] fetal development . . . is a

23

reasonable measure to ensure an informed choice." Similarly, it would have sounded strange had Justice Thomas stated that "the Eighth Amendment's prohibition on cruel and unusual punishment historically concerned only injuries [about] a criminal sentence." This distinction is important in that, generally speaking, "relating to" has a broader meaning when used as a preposition than when used as a phrasal verb.

One cannot clearly discern which of these senses Congress intended from the CPSIA's text. That Congress failed to define "relating to" in the CPSIA encumbers the examination. Yet this omission does not end the textual inquiry. It is a time-honored principle that courts must construe statutes as a whole. *See, e.g., Graham Cnty. Soil and Water Conserva. Dist. v. U.S. ex rel. Wilson*, 130 S. Ct. 1396, 1404 (2010) (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561, 568 (1995)). As a corollary, courts may consider the way Congress has used a specific term elsewhere in a statute to glean its meaning. *See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 130 S. Ct. 1605, 1615 (2010) (citing *Dada v. Mukasey*, 554 U.S. 1, 16 (2008)). Likewise, courts may look to the entire statutory scheme surrounding an ambiguous term for clues as to its meaning. *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1754 (2011) (citing *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988)).

This comparative approach is also inconclusive as to the purport of the at-issue phrase. Concededly, Congress's use of "relating to" in the CPSIA and its sibling statute, the Consumer Product Safety Act ("CPSA"), Pub. L. No. 92-573, 86 Stat. 1207 (1972) (codified as amended in scattered sections of 15 U.S.C.), lends lukewarm support to the inference that Congress used it prepositionally in the provisions in dispute. For instance, a CPSIA provision requires the Commission to forward to the manufacturer "information **relating to** the serial or model number of the product" where the Commission obtains such information. *See* 15 U.S.C.A. §

24

2055a(e)(5)(A) (West 2009) (emphasis added). By way of further illustration, the CPSA requires the Commission to "maintain an Injury Information Clearinghouse to collect . . . injury data . . . relating to the causes . . . of death, injury, and illness associated with consumer products." 15 U.S.C. § 2054(a), (1) (2006) (emphases added). In the Court's estimation, these examples constitute prepositional uses of "relating to." Indeed, in the CPSA provision, Congress uses "relating to" in the same sentence as "associated with," strongly suggesting a prepositional use of "relating to." The prepositional use of "relating to" appears to preponderate in the CPSA and its amending statutes. *See generally* 15 U.S.C.A. §§ 2051 *et seq.* (West 2009).

The Court is reluctant to read too much into these observations. Aside from the disputed provisions, it is unclear that all of Congress's uses of "relating to" in the CPSIA are prepositional. For example, the section in which the disputed provisions appear also prescribes that the database shall include "[i]nformation derived by the Commission . . . relating to a voluntary corrective action taken by a manufacturer." 15 U.S.C.A. § 2055a(b)(1), (B) (West 2009) (emphasis added). Replacing "relating to" in this provision with synonyms for either the prepositional or the verbal use of "relating to" would render a grammatically correct and natural sentence. For instance, Congress could have meant "information derived by the Commission concerning a voluntary corrective action taken by a manufacturer." Conversely, Congress could have meant "information derived by the Commission connected with a voluntary corrective action taken by a manufacturer."

The inference that Congress might have meant to use "relating to" in § 2055a(b)(1)(B) to connote a connection becomes clearer when one substitutes "relating to" with the linguistic cousin of the phrase "connected with": "in connection with." The resultant clause would thus read: "information derived by the Commission in connection with a voluntary corrective action

25

Case 8:11-cv-02958-AW   Document 69 *SEALED* (Court only)   Filed 10/09/12   Page 26 of 73

taken by a manufacturer." Admittedly, "in connection with" is a preposition, not a verb. *See, e.g.,*
*In connection with Synonyms*, Thesaurus.com, http://thesaurus.com/browse/in+connection+with
(last visited June 18, 2012). Nevertheless, one cannot mistake its close nexus with the concepts
of connection and association. In short, then, the CPSIA's other uses of "relating to" fail to
illustrate its part of speech, let alone its elusive meaning.

The same goes for the CPSA and its amendments. Consider the provision requiring the
Commission to "maintain an Injury Information Clearinghouse to collect . . . injury data . . .
relating to the causes . . . of death, injury, and illness associated with consumer products." 15
U.S.C. § 2054(a), (1) (2006) (emphases added). Even though the use of "relating to" and
"associated with" in the same clause implies a different meaning, this apparent contradistinction
may just reflect a stylistic preference to avoid redundancy. *Cf. United States v. Cook*, 384 U.S.
257, 260 (1996) (crediting the United States' argument that statutory language merely reflected
Congress's stylistic preference). Furthermore, while the prepositional use of "relating to" appears to
prevail in the CPSA and its amending statutes, one can likewise limit these examples. *Cf, e.g.,* 15
U.S.C. § 2060(g)(1) (2006) (using "relating to" prepositionally simply to state the subject of statutory
provisions).

The analysis above demonstrates the facial ambiguity of "relating to." Despite this
ambiguity, the Court need not definitively determine its part of speech and underlying contextual
meaning. For the Commission's own regulations make it copiously clear that the Commission
has adopted the view that the report of harm must be "related to" (i.e., "connected with" or
"associated with") the consumer product for the report to qualify for publication on the database.
*See* 16 C.F.R. § 1102.10(d)(3) (2011); *id.* § 1102.10(f)(9)(3); *id.* § 1102.20(b)(3)-(4); *id.*§
1102.26(a)(1)(iii), (2)(iii). Thus, a determination that the ████████ does not relate to ████

████████ would show that the Commission's decision contradicts its own regulations. This outcome, in turn, would tend to establish that the Commission's conduct is arbitrary and capricious. To be sure, other relevant considerations could strengthen this conclusion.

Before expounding wherein the Commission's actions are arbitrary and capricious, the Court must entertain two preliminary issues: (1) whether the Court must defer to the Commission's interpretation of its ambiguous implementing regulations as per *Auer v. Robbins*, 519 U.S. 452 (1997); and (2) whether the CPSIA's facial ambiguity calls for *Chevron* deference. *See generally Chevron*, 476 U.S. 837. The Court addresses these arguments in turn.

*1.    The Propriety of Deference Under* Auer

A regulation must be ambiguous for it to qualify for *Auer* deference. This begs the question: What did the Commission mean when it mandated that the report of harm must be "related to" the consumer product? As indicated above, dictionaries are a leading source of words' ordinary meaning. *See, e.g., Schindler Elevator Corp. v. United States ex rel. Kirk*, 131 S. Ct. 1885, 1891 (2011); *United States v. Bestfoods*, 524 U.S. 51, 66–67 (1998); *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 224–26 (1994). In its relevant sense, Merriam Webster's Online Dictionary defines relate as "to have relationship or **connection**." *Relate*, Merriam Webster.com, http://www.merriam-webster.com/dictionary/relate (last visited June 18, 2012). Merriam Webster's then defines "relationship" as "relation" and, in turn, relation as "an aspect or quality . . . that **connects** two or more things or parts as being or belonging or working together or as being of the same kind *<the relation of time and space>*." *Relation*, Merriam Webster.com, http://www.merriam-webster.com/dictionary/relation (last visited June 18, 2012) (first emphasis added). Dictionary.com's definition of relate conforms to Merriam Webster's. Dictionary.com defines relate as "to have some relation." *Relate*, Dictionary.com,

Case 8:11-cv-02958-AW   Document 69 *SEALED* (Court only)   Filed 10/09/12   Page 28 of 73

http://dictionary.reference.com/browse/relate (last visited June 18, 2012). Relation, in turn, is

defined as "an existing **connection**; a significant **association** between or among things: *the*

*relation between cause and effect.*" *Relation*, Dictionary.com,

http://dictionary.reference.com/browse/relation (last visited June 18, 2012) (some emphases

added). These definitions are representative of those that other quotidian dictionaries advance.

*See. e.g., relation*, The Free Dictionary.com, http://www.thefreedictionary.com/relation (last

visited June 18, 2012) (some emphases added) (defining relation as "[a] logical or natural

association between two or more things; relevance of one to another; **connection**: *the relation*

*between smoking and heart disease*"). Similar examples abound.

Still, it is difficult to distill a common denominator from these definitions. Clearly, for

two (or more) things to relate to each other, they must bear a connection or association. Yet, to

some extent, the words connection and association are intrinsically indefinite. A restrictive

reading of these terms would support the assertion that "relate to" connotes a significant

correlative or logical relationship. A broad reading, by contrast, would boost the thesis that

"relate to" simply signifies the existence of a connection or association, however attenuated. In

short, the Commission's requirement that the report of harm relate to the consumer product

crosses the threshold of facial ambiguity.

Notwithstanding this ambiguity, the Court declines to defer under *Auer* to the

Commission's capacious construction of "relate to." The United States Supreme Court has held

that courts owe ambiguous agency regulations no deference where "the underlying regulation

does little more than restate the terms of the statute itself." *Gonzales v. Oregon*, 546 U.S. 243,

257 (2006). In *Gonzalez*, the Court considered "whether the Controlled Substances Act allow[ed]

the United States Attorney General to prohibit doctors from prescribing regulated drugs for use

in physician-assisted suicide, notwithstanding a state law permitting the procedure." 546 U.S. at 248–49. Generally, the Controlled Substances Act ("CSA") required a valid prescription for the distribution of drugs used in physician-assisted suicide and defined valid prescription as one "issued for a legitimate medical purpose." *See id.* at 257 (quoting 21 U.S.C. § 830(b)(3)(A)(ii) (2006)). Tracking the language of this provision, a regulation that the Attorney General promulgated prescribed that "every prescription for a controlled substance 'be issued for a legitimate medical purpose.'" *Id.* at 250 (quoting 21 C.F.R. § 1306.04(a) (2005)). The Attorney General issued an Interpretive Rule pertinently providing that "'assisting suicide is not a "legitimate medical purpose" within the meaning of 21 C.F.R 1306.04 (2001).'" *Id.* at 254 (emphasis added) (quoting 66 Fed. Reg. 56,608 (2001)).

The Government argued that the Interpretive Rule elaborated the relevant regulation and, therefore, warranted *Auer* deference. *Id.* at 256. The Court rejected this argument. *Id.* at 256–57. In deciding that *Auer* deference was inappropriate, the Court observed that the relevant regulation repeated the related statutory provision. *Id.* at 257. The Court reasoned that "the existence of a parroting regulation does not change the fact that the question here is not the meaning of the regulation but the meaning of the statute." *Id.* In other words, "[a]n agency does not acquire special authority to interpret its own words when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language." *Id.* at 257.

In this case, as in *Gonzalez*, the Commission's regulations repeat the relevant statutory language. As spelled out above, the CPSIA requires the database to include "[r]eports of harm relating to the use of consumer products." 15 U.S.C.A. § 2055a(b)(1)(A) (West 2009) (emphasis added). Regurgitating this language, a Commission regulation defines report of harm as "any

29

information . . . regarding [harm] . . . **relating to** the use of a consumer product." 16 C.F.R. § 1102.6(b)(8) (2011). Again echoing the CPSIA's language, a separate regulation prescribes that the harm the report describes must be "**related to** use of the consumer product." *Id.* § 1102.10(d)(3). The regulations are replete with similar examples. Indeed, the Commission seems to concede that "[t]he [r]egulations closely track the enabling statute." Def.'s Mem. Opp'n Pl.'s Mot. Prelim. Inj. 18, Doc. No. 16. Thus, like the Attorney General in *Gonzalez*, the Commission failed to use its expertise and experience to formulate the regulations. In such cases, the Commission does not acquire special authority to interpret its own words. Accordingly, the Commission's conclusion that ███████████████████████ deserves no *Auer* deference.

    2.    *The Propriety of Deference Under* Chevron

The conclusion that the Commission's interpretation of its regulations deserves no *Auer* deference does not apodictically obviate the prospect of deference to its interpretation of the CPSIA. For the Court has yet to assess whether the Commission's decision merits *Chevron* deference. *See Gonzalez*, 546 U.S. at 258–69 (considering whether the Attorney General's Interpretive Rule warranted *Chevron* deference after concluding that it deserved no *Auer* deference); *see also A.T. Massey Coal Co. v. Holland*, 472 F.3d 148, 154 (4th Cir.).

    a.    *Chevron* Background

*Chevron* sets forth a two-step framework regulating review of an agency's construction of a statute it administers. "First, always, is the question whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. "If the intent of Congress is clear, that is the end of the matter; for the court . . . must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. Courts refer to this first step as "*Chevron* step one." *See, e.g., Mayo*

*Found. for Med. Educ. and Research v. United States*, 131 S. Ct. 704, 711 (2011). "If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute . . . ." *Chevron*, 467 U.S. at 843 (footnote omitted). "Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* Courts refer to this second step as "*Chevron* step two." *See, e.g., Mayo Found.*, 131 S. Ct. at 711. "This analytical approach applies not only when a regulation is directly challenged . . . but also when a **particular agency action** is challenged . . . ." *Kentuckians for Commonwealth Inc. v. Rivenburgh*, 317 F.3d 425, 439 (4th Cir. 2003) (emphasis added); *see also* Stephen G. Breyer et al., Administrative Law and Regulatory Policy: Problems, Text, and Cases 341 (6th ed. 2006) ("It is now accepted that the same level of deference applies to interpretations invoked by an agency to decide adjudications.").[6]

        i.    *Chevron* Step One

    As the foregoing discussion demonstrates, the meaning of the language "reports of harm relating to the use of consumer products" is ambiguous. The CPSIA's facial ambiguity does not, however, lead the Court ineluctably to the application of *Chevron* step two. "Under the first step

---

[6] In the wake of *United States vs. Mead Corp.*, 533 U.S. 218 (2001), commentators coined the term "*Chevron* step zero." *See, e.g.*, Thomas W. Merrill & Kristin E. Hickman, *Chevron's Domain*, 89 Geo. L.J. 833, 838 (2001) (coining the term). Generally, *Chevron* step zero refers to the *Mead* Court's holding that courts may not apply the *Chevron* analysis unless (1) "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law" and (2) "the agency interpretation claiming deference was promulgated in the exercise of that authority." *See Mead*, 533 U.S. at 226–27. The *Mead* Court clarified that "[d]elegation of such authority may be shown in a variety of ways, as by an agency's power to engage in . . . notice-and-comment rulemaking." *Id.* at 227. Here, the CPSIA explicitly authorizes the Commission to issue regulations necessary for its implementation. CPSIA § 3, 122 Stat. at 3017. Furthermore, the Commission engaged in notice-and-comment rulemaking that culminated in the issuance of a final rule establishing the publicly available database. *Compare CPSC | About*, CPSC.gov, http://www.saferproducts.gov/About.aspx (last visited June 18, 2012) (making available notice-and-comment rulemaking documents), *with* Publicly Available Consumer Product Safety Information Database, 16 C.F.R. § 1102.02 *et seq.* (2011) (final rule stemming from the process). Thus, the Commission has easily satisfied *Chevron* step zero in this case.

of *Chevron*, a reviewing court is to 'employ [ ] traditional tools of statutory construction' to

determine whether Congress addressed 'the precise question at issue.'" *Nat. Elec. Mfrs. Ass'n v.*

*U.S. Dep't of Energy*, 654 F.3d 496, 504–05 (4th Cir. 2011) (quoting *Chevron*, 467 U.S. at 842,

843 n.9). The Fourth Circuit has "described legislative history as one of the traditional tools of

interpretation to be consulted at *Chevron*'s step one." *Id.* at 504–05; *see also, e.g., Rust v.*

*Sullivan*, 500 U.S. 173, 186–87 (1991) (reasoning that resort to *Chevron* step two is proper

where review of the statute's legislative history fails to resolve its ambiguity). At the same time,

the Fourth Circuit has cautioned courts against overreliance on legislative history at *Chevron*

step one. *Nat. Elec.*, 654 F.3d at 505.

The legislative history that the Parties discuss fails to resolve the CPSIA's ambiguity

regarding the meaning of "relating to." The Commission's primary argument is that the CPSIA

reflects Congress's intent to quicken the time it takes the Commission to release reports of harm

to the public. In the Commission's estimation, the CPSA circumscribed the Commission's

capacity to publish injury data identifying manufacturers. The Commission cites two examples.

One, before the Commission could publish injury data identifying manufacturers, the CPSA

required the Commission to notify the manufacturer of such data and allow it to respond. *See* 15

U.S.C. § 2055(b)(1) (2006). Two, under the CPSA, manufacturers had a private right to seek an

injunction enjoining the disclosure of the data. *See* 15 U.S.C. § 2055(b)(3)(A) (2006). The

Commission observes that Congress exempted from these CPSA provisions the reports of harm

whose publication, in proper circumstances, the CPSIA commands. *See* 15 U.S.C.A. §

2055a(a)(f)(1) (West 2009).

According to the Commission, the CPSIA's goal of disencumbering the dissemination of

injury data counsels for an expansive reading of the term "relating to." To strengthen this

conclusion, the Commission cites two Congressmen's floor statements for the proposition that the CPSIA contemplates swift publication in lieu of time-consuming investigation. *See* 154 Cong. Rec. S7867–68 (daily ed. July 31, 2008) (statement of Sen. Inouye); 154 Cong. Rec. H7577–78 (daily ed. July 30, 2008) (statement of Rep. Markey); *but cf. Garcia v. United States*, 469 U.S. 70, 76 (1984) (floor statements are less probative of Congressional intent than other common sources of legislative history).

That this sparse legislative history fails to compel the conclusion that Congress intended "relating to" to cover anything under the sun is self-evident. In fact, some of the floor statements that Congressmen made in the prelude to the CPSIA's passage equally support the inference that Congress intended "relating to" to create a closer nexus between the report of harm and the use of the consumer product. For his part, Senator Levin stated "This bill will . . . require CPSC to provide consumers with a user-friendly database on deaths and serious injuries caused by consumer products." 154 Cong. Rec. S7870 (daily ed. July 31, 2008) (Statement of Sen. Levin) (emphasis added). Similarly, in discussing the CPSIA's ameliorative aims, Representative Markey deplored "information that does not identify which specific products are causing problems and is therefore of no real use to consumers." 153 Cong. Rec. H16,886 (Dec. 19, 2007) (statement of Rep. Markey) (emphasis added). At a minimum, then, the legislative history is a wash. Hence, mindful of the Fourth Circuit's admonition against overreliance on legislative history at *Chevron* step one, the Court proceeds to *Chevron* step two.

ii.     *Chevron* Step Two

*Chevron* step two asks whether the agency based its action on a "permissible construction of the statute." *Chevron*, 467 U.S. at 843. An agency's construction of an ambiguous statute is permissible where it is reasonable in light of the structure and purpose of the statute. *See Regions*

*Hosp. v. Shalala*, 522 U.S. 448, 457 (1998). It follows that an agency's interpretation of an
ambiguous statute is impermissible where it is "'arbitrary or capricious in substance.'" *Mayo
Found.*, 131 S. Ct. at 711–12 (quoting *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232,
242 (2004)); *cf. State Farm*, 463 U.S. at 43 (emphasis added) (citation and internal quotation
marks omitted) (even though "scope of review under [APA's] arbitrary and capricious standard
is narrow," agency must "articulate a satisfactory explanation for its action including a **rational
connection** between the facts found and the choice made"). Thus, the dispositive issue is
whether the Commission's determination that ███████████████████████████ is
arbitrary or capricious in substance. But, before crossing this bridge, the Court must broach an
initial analytic barrier.

> (1)    The Propriety of Condensing Arbitrary and
>        Capricious Review Under *Chevron* and the
>        APA

The ultimate issue is whether the Commission's decision constitutes arbitrary and
capricious conduct under the APA. It is thus advisable to ask whether a determination that the
Commission's decision is arbitrary and capricious within the meaning of *Chevron* compels the
conclusion that the Commission's decision is arbitrary and capricious for APA purposes.

For present purposes, the Court concludes that it does. In a recent decision, the Supreme
Court strongly suggested that the "arbitrary and capricious" analysis under *Chevron* overlaps
with the same under the APA. *See Judulang*, 132 S. Ct. at 484 n.7. In *Judulang*, the Court denied
the Government's request to analyze the case under *Chevron* step two. *Id.* Owing to reasons
irrelevant here, the Court opted instead to analyze the case under the APA. *See id.* In so doing,
the Court stated unequivocally that "[were we to analyze the case under *Chevron*], our analysis
would be the same, because under *Chevron* step two, we ask whether an agency interpretation is

arbitrary or capricious in substance." *Id.* (internal quotation marks omitted) (citing *Mayo Found.*, 131 S. Ct. at 711). The Supreme Court's decisive dictum in *Judulang* reflects the prevailing view. *See, e.g., NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 255–56, 264 (1995) (rejecting respondent's APA claim because agency's construction of ambiguous provisions of National Bank Act was reasonable under *Chevron*); *Rivenburgh*, 317 F.3d at 439 (courts must apply *Chevron* analysis when reviewing particular agency action under the APA); *cf.* Breyer et al., *supra* at 328; Laurence H. Silberman, Chevron—*The Intersection of Law & Policy*, 58 Geo. Wash. L. Rev. 821, 827–28 (1990). *But cf., e.g., Nat. Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 1000 (2005) (reviewing, albeit briefly, agency action under the APA after having extensively analyzed it under *Chevron* step two); *Am. Petroleum Inst. v. U.S. EPA*, 216 F.3d 50, 57 (D.C. Cir. 2000) (citations omitted) ("The second step of *Chevron* analysis and *State Farm* arbitrary and capricious review overlap, but are not identical."). Therefore, in deciding whether the Commission's decision is arbitrary and capricious, the Court consolidates the *Chevron* step two and APA arbitrary and capricious analyses.

           (2)      The Commission's Arbitrary and Capricious Action

Now the Court must explain why the Commission's decision to publish the incident report is arbitrary and capricious. Although the Supreme Court has yet to navigate the full waters of arbitrary and capricious conduct, it provided a polestar in this voyage in *Judulang v. Holder*, *supra*. In *Judulang*, the Court considered whether the Board of Immigration Appeals' ("BIA") policy for deciding whether an alien is eligible for relief from deportation under a since-repealed provision of the Immigration and Nationality Act ("INA") was arbitrary and capricious under the

APA. *Judulang*, 132 S. Ct. at 483. The factual background in *Judulang* is complex; the Court sketches its contours in the interest of clarity and concision.

Until its 1996 repeal, § 212(c) of the INA authorized the Attorney General to *admit* aliens who had committed certain crimes (e.g., an alien who traveled abroad and sought to reenter the United States). *Id.* at 479–80 (citing 42 U.S.C. § 1182(c) (1994)). By its terms, § 212(c) did not apply when the Government sought to *deport* aliens who had committed certain crimes. *Id.* at 480. Over time, this discrepancy induced the BIA to apply § 212(c) in deportation proceedings irrespective of an alien's travel history. *Id.*

Deciding when to deport aliens under § 212(c) is still complicated. *Id.* at 481. This complexity traces to two primary sources. First, § 212(c) facially applied only to decisions whether to admit criminal aliens. *Id.* Second, immigration laws then—as now—provided "two separate lists of substantive grounds" for admission and deportation actions. *Id.* at 479. Against this backdrop, the BIA had to formulate an approach to determine whether to refrain from deporting criminal aliens. *Id.*

The BIA developed an approach called the "comparable grounds rule." *Id.* at 481 (citation omitted). This approach evaluates whether the ground for deportation (i.e., the crime committed) has a "close analogue" in the statute's list of admission grounds (i.e., the list of offenses for which the Attorney General is authorized to admit a criminal alien). *Id.* (citations omitted). In other words, the criminal alien is eligible for § 212(c) relief if the crime for which the Department of Homeland Security ("DHS") seeks to deport him is "substantially equivalent" to one of the listed offenses that the Attorney General may, in essence, excuse.[7]

---

[7] For the sake of simplicity, the Court hereafter refers to each of the following entities as "the Government": BIA, DHS, and the Attorney General.

36

The Petitioner, Joel Judulang, originally immigrated to the United States from the Philippines. *Id.* at 483. The Government charged *Judulang* with having committed an "aggravated felony" involving a "crime of violence" based on a manslaughter conviction. *Id.* (citations omitted). The Government affirmed an immigration judge's order to deport Judulang. *Id.* The Government held that Judulang was ineligible for § 212(c) relief because the "crime of violence" did not compare to any admission ground, including one involving crime of "moral turpitude." *Id.* The Ninth Circuit affirmed. *Id.*

The Court held that the Government's action was arbitrary and capricious because it hinged "a deportable alien's eligibility for discretionary relief on" "a matter irrelevant to the alien's fitness to reside" in the United States: "the **chance** correspondence between statutory categories." *See id.* at 484 (emphasis added). The Court enunciated that "agency action must be based on non-arbitrary, relevant factors," which means that action "must be **tied** . . . to the purposes" of the statute it aims to implement. *See id.* at 485 (emphasis added). In other words, "[a] method for disfavoring deportable aliens that bears no **relation** to these matters—that neither focuses on nor **relates to** an alien's fitness to remain in the country—is arbitrary and capricious." *Id.* (emphasis added). In short, the chance overlap, or lack thereof, between Judulang's category of offense and the categories of offenses for which the Government could have furnished him § 212(c) relief was not related in any sensible way to aims of the applicable immigration laws. *See id.* at 485–86.

The *Judulang* Court provided other examples of the arbitrary and capricious nature of the comparative-grounds rule. In one case, the deportation offense was "aggravated felony involving sexual abuse of a minor" and the closest admission ground was a "crime [of] moral turpitude." *Id.* at 486 (alteration in original) (citation and internal quotation marks omitted). The

37

Government denied relief in this case because "the moral turpitude ground addresses . . . a much broader category of offenses." *Id.* (citation and internal quotation marks omitted). Thus, counterintuitively, the rule could preclude relief for aliens whose crimes fit squarely within a ground for admission. *Id.* at 486. The Court also bemoaned that a petitioner's outcome "may rest on the happenstance of an immigration official's charging decision." *Id.* (emphasis added). That is, "an alien's prior conviction may fall within a number of deportation grounds, only one of which corresponds to an [admission] ground." *Id.* "So . . . everything hangs on the **fortuity** of an individual official's decision." *Id.* (emphasis added). In short, the comparative-grounds rule made the Government's immigration decision a "sport of chance." *Id.* at 487 (citations and internal quotation marks omitted). Accordingly, the Court concluded the Government's decision was arbitrary and capricious. *Id.*

Although one can distinguish *Judulang*'s underlying facts, the principles articulated therein control the outcome in this case. Here, as in *Judulang*, the Commission's decision to publish the report bears no sensible relation to the purpose the CPSIA aims to advance: to enhance the Commission's capacity to disseminate information to consumers regarding unsafe products. *Compare supra* pp. 2–3, 32 (discussing CPSIA provisions designed to enhance the public's access to consumer product safety information), *with* CPSIA, 122 Stat. at 3016 (announcing that the CPSIA seeks to "establish consumer product safety standards and other safety requirements for children's products"), *and Wallace v. Jaffree,* 472 U.S. 38, 43 n.22 (1985) (a statute's preamble may evidence its purpose). Similar to the comparative-grounds rule in *Judulang*, the Commission's decision that the report is publishable hinges on the happenstance that ██████████████████████████████ To reiterate, it states:

██████████████████████████████████████████████████████████

AR000255. In short. the report states that ████████████████████████

████████████████ But the report does not indicate how ████████ is connected to ██

████████ Nor does it specify any other ████████████ Indeed, in stating that ██████

████████████████████████████████████████████████████ the report

would seem to discount such a possibility.

████████████████ fails to supply the missing link between ██████████████

████████████ As noted, ████████████████████████████████████

████████ The Commission argues that ████████████ connects the ████████████

████████ because it states that ██████████████████████████████

AR000067. Yet one cannot square this rationale with the Commission's decision to redact the

following language from the second version of the report on the basis that it was materially

inaccurate: ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

Dr. ████'s risk of harm analyses also fail to associate ████████ to ██ use of the ████ Memorialized in a one-page email, Dr. ████'s first analysis is a lesson in speculation. It reads:



AR000046 (emphases added). In fact, although asserting that ████████ present a general risk of harm, Dr. ████ acknowledged that "I don't think that necessarily means that the product . . . was the cause of the harm done to the victim in this case." *Id.* In sum, Dr. ████'s bases his conclusion that ████████ was "associated with the use of the product" on the general risk of harm that ████████ supposedly pose. *See id.*

Likewise memorialized in a one-page email, Dr. ████'s second risk of harm analysis further discredits the idea that ████████████████████████ AR000244. Prepared in the wake of Plaintiff's discovery of the ████ report, the second analysis actually agrees with Plaintiff's expert that ████ was "the injury mechanism." *Id.* Concededly, through both the supplemental declaration of Mr. Ray and multiple memoranda, the Commission vigorously disputes that the evidence in the administrative record indicates that the ████████

█████ Mr. Ray's supplemental declaration, however, is a post hoc rationalization that warrants no weight. *See Dow AgroSciences*, 821 F. Supp.2d at 798. Contrary to the Commission's contentions, the record does not reflect that Mr. Ray submitted the supplemental declaration to "illuminate or explain the original record." Def.'s Reply Supp. Mot. Summ. J. 9, Doc. No. 47. Prepared for litigation purposes three weeks after Dr. ████'s analysis, the supplemental declaration essentially regurgitates Dr. ████'s conclusions save only his determination that ████ was the injury mechanism. *Compare* AR000244, *with* AR000280–81. Mr. Ray offers no explanation for disagreeing with only this aspect of Dr. ████'s analysis and, with a master's degree in mechanical engineering,[8] it is unclear that he is competent to come to such a conclusion. Furthermore, although the arguments the Commission mounts in its memoranda have more merit, they at most create a reasonable inference, however tenuous, that ████ failed to cause ████ However, even if ████████ the Commission would find itself back where it started; to wit, unable to establish the necessary nexus between ████ and ████

Alternatively, the Commission argues that ████ would relate to ████ even if ████ because ████████ ████ The Commission bases this argument primarily on Dr. ████'s second risk of harm analysis, in which he opined,

████████████████████████████████████

---

[8] *DeWane Ray | Linkden*, Linkedin.com, http://www.linkedin.com/in/dewaneray (last visited June 18, 2012).



AR000244 (emphases in boldface added).

The salient flaw in this analysis is that it is purely speculative. Dr. ██████ identifies ██████ as "the injury mechanism" yet proceeds to speculate that ████████ ████████████████████████████████ *Id.* (emphasis added). Similarly, Dr. ████ speculates that "████████████████████████████████████████ ██████████████████" *Id.* (emphasis added). Although the "related to" standard requires a showing of connection in lieu of causation, neither the enabling statute nor the implementing regulations suggests that rank speculation of this sort suffices to show such an association.

Additionally, the record evidence negates the notion that the ██████████ ████████████████ As mentioned earlier, in the course of its investigation, the Commission compiled an epidemiologic investigation report including, inter alia, narratives regarding the ██████████ *See* AR000119 (first page of report). One narrative states that ██ ████████████████████████████████████ AR000121; *see also* AR000134. This narrative further states that ████████████████████████████ ████████████████ *Id.* On these facts, there is no reason to think that ██████████ ████████████████████████ Notably, moreover, narratives prepared by the ███

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████ *See* AR000131; AR000134; AR000136; *see also* AR000122. ███████████████████████████████████

████████ *Compare* AR000122, *with* AR000131. Hence, the record evidence gainsays Dr.

████ 's speculative conclusions.

In the final analysis, the Commission predicates its decision to publish the report on the

coincidence that the ████████████████████████████ Contrary to the principles

enunciated in *Judulang*, this conduct converts the CPSIA's remedial scheme into a "sport of

chance." *Judulang*, 132 S. Ct. at 487 (citations and internal quotation marks omitted). Although

it is theoretically possible that ████████████████████████ it is, at a bare

minimum, equally possible that it did not. That is, in some cases, the product █████████████

████ will bear some relation to ████████; in other cases, it will not. This fact, standing alone, "is

as extraneous to the merits of the case as a coin flip would be." *Judulang*, 132 S. Ct. at 486.

Indeed, as elucidated above, the evidence strongly suggests that ████████████ stemmed from

other sources (i.e., ████████████████████████████████████

████████████████████). Therefore, the odds that ████████ was "involv[ed]" in ████

████████████ are significantly lower than a coin flip. *Cf. CPSC | About*, CPSC.gov,

http://www.saferproducts.gov/About.aspx (last visited June 18, 2012) (emphasis added) (the

Commission's stating that "[t]hrough SaferProducts.gov [concerned parties] can submit reports

of harm . . . involving consumer products"). In sum, the Commission's decision to publish the

report bears no rational relationship to the public safety purposes the CPSIA purports to promote.

Accordingly, the Commission's conduct is arbitrary and capricious and, hence, constitutes an unreasonable construction of the CPSIA.

   3.   *Whether the Commission's Decision to Publish the Report Constituted an Abuse of Discretion*

      a.   Unexplained Inconsistency

Other principles of administrative law buttress the conclusion that the Commission's conduct runs afoul of the APA. Typically, an agency's interpretation of a statute or its own regulations amounts to an abuse of discretion where it strays substantially from previous agency interpretations. *See Malcomb v. Island Creek Coal Co.*, 15 F.3d 364, 369 (4th Cir. 1994) (citing cases); *Littell v. Morton*, 445 F.2d 1207, 1211 (4th Cir. 1971) (citation and internal quotation marks omitted) (agency decision "would be an abuse of discretion if it . . . inexplicably departed from established policies"); *cf. Brand X*, 545 U.S. at 981 (citing *State Farm*, 463 U.S. at 46–57) ("Unexplained inconsistency is . . . a reason for holding an interpretation to be [] arbitrary and capricious . . . under the [APA].").

In this case, the U.S. Government Accountability Office ("GAO") has issued a report stating that the Commission approved five material inaccuracy claims because "the evidence in the report of harm did not show that the product was the **source** of the problem." U.S. Government Accountability Office, GAO 12-30, Consumer Product Safety Commission: Action Needed to Strengthen Identification of Potentially Unsafe Products 15 (2011) (emphasis added), *available at* http://www.gao.gov/assets/590/585725.pdf. For instance, the Commission rejected as materially inaccurate a report regarding a stove whose gas leak the submitter attributed to the stove but that a service technician later traced to a loose pipe. *Id.* at 15.

If this report fails to pass muster under the CPSIA and the Commission's regulations, it is difficult to discern why the disputed report should suffer a different fate. Just like the submitter

44

attributed the gas leak to the stove, so does the instant report purport to attribute ████████
████████ Furthermore, just as the service technician later traced the gas leak to a loose pipe,
so did the epidemiological report, as interpreted by ████████ later trace the cause of ████████
████████ Even if the evidence fails to positively prove that ████████, the
GAO report expressly states that the Commission decided not to publish reports of harm where
"the evidence **in the report** of harm did not show that the product was the **source** of the
problem." GAO, *supra* at 15 (emphasis added). "Source" is a synonym for "cause." *See, e.g.,*
*Source.* Merriam-Webster.com, http://www.merriam-webster.com/dictionary/source (last visited
June 18, 2012). "The evidence in the report" is that the ████████████████
████████████████ To conclude that such exiguous "evidence" suffices to show
that the ████████████ impels a lengthy—and perhaps unparalleled—leap in
logic.

Moreover, notwithstanding the multitudinous arguments the Commission has mounted in
its multiple memoranda, the Commission has utterly failed to explain the inconsistency between
its conduct in this case and its prior conduct as evidenced in the GAO report. Plaintiff has argued
throughout the litigation that the Commission's decision violates past precedent because ██
██ is not the source of the problem. *See, e.g.,* Pl.'s Mem. Supp. Mot. Prelim. Inj. 20, Doc.
No. 9-1; Pl.'s Reply Supp. Cross-Mot. Summ. J. 2–3, Doc. No. 48. Yet, as Plaintiff aptly notes,
the Commission appears to make the astonishing argument that it does not have to explain its
inconsistent precedent because the damaging GAO report is not in the administrative record. *See*
Pl.'s Reply Supp. Cross-Mot. Summ. J. 2, Doc. No. 48 (citing Def.'s Reply Supp. Mot. Summ. J.
10 & n.10, Doc. No. 47). Tellingly, the Commission buried this facile argument in a footnote for
the Court to infer, failing to explicitly so argue. *See* Def.'s Reply Supp. Mot. Summ. J. 10 &

n.10, Doc. No. 47. Despite the Commission's thinly veiled effort to excuse its unexplained inconsistency, it is well-established that "the district court [may] . . . supplement the record with background information in order to determine whether the agency considered all of the relevant factors." *See Am. Wildlands*, 530 F.3d at 1002 (internal quotation marks omitted) (citing *James Madison*, 82 F.3d at 1095). Therefore, in the interest of thoroughness and fundamental fairness, the Court treats the GAO report as part of the administrative record. The Commission's complete failure to discuss, let alone explain, the inconsistency between its conduct in this case and its prior conduct compels the conclusion that its conduct, beyond being arbitrary and capricious, constitutes an abuse of discretion.

      b.    Material Inaccuracy

     The Commission's decision also violates its own definition of material inaccuracy. The CPSIA does not define material inaccuracy and its meaning is not clear using ordinary principles of statutory interpretation. *See* 15 U.S.C.A. § 2055a(c)(4) (West 2009). Filling this gap, the Commission defines materially inaccurate information as information in a report of harm "that is false or misleading, and which is so substantial and important as to affect a reasonable consumer's decision making about the product." 16 C.F.R. § 1102.26(a)(1) (2011). Unlike the Commission's elaboration of "relating to," this regulation does not parrot language from the CPSIA. Therefore, the Commission's interpretation of it might merit *Auer* deference. *See supra* Part III.A.1.

     As the GAO report demonstrates, however, interpreting this regulation to permit the publication of the incident report would be strikingly inconsistent with the Commission's prior interpretations of materially inaccurate information. The report unequivocally states that the Commission found reports of harm to be materially inaccurate where, as here, "the evidence in

the report of harm did not show that the product was the source of the problem." GAO, *supra* at 15. Therefore, the Commission's interpretation deserves no *Auer* deference, and the publication of the report amounts to an abuse of discretion. *See Malcomb*, 15 F.3d at 369; *cf. United States v. Caceres*, 440 U.S. 741, 754 (1979) ("Agency violations of their own regulations . . . may well be inconsistent with the standards of agency action which the APA directs the courts to enforce.").

The Commission's definition of materially inaccurate information has two prongs: (1) misleading information that is (2) so substantial and important as to affect a reasonable consumer's decision making about the product. 16 C.F.R. § 1102.26(a)(1) (2011). The incident report is misleading because it creates a false impression that ▮▮▮▮▮▮ played a role in ▮▮▮▮▮▮▮▮ The report's plain import is that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ The report mentions no other consumer products and ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ by referring to them by their personal names. The subsequent statement that ▮ ▮▮▮▮▮▮▮▮▮▮▮▮ does not extenuate or eliminate the taint that the preceding statements create, partly because it suggests no other source. In the end, readers are left to ponder the featured fact that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Thus, to insist that the report fails to insinuate a link between ▮▮▮▮▮▮▮▮▮▮▮▮▮ is to cavil.

As for prong (2), the report is sufficiently important to affect a reasonable consumer's decision making because common sense says that a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ would be dissuaded from purchasing it. Furthermore, even though an unnamed local agency originally submitted it, the report bears the Government's stamp of approval through its publication on an official website that, by its terms, is a repository of reports regarding "unsafe product[s]." *See SaferProducts.gov*, CPSC.gov,

http://www.saferproducts.gov/ (last visited June 18, 2012). Revealingly, 

 *SaferProducts.gov*,

CPSC.gov. http://www.saferproducts.gov/ (last visited June 18, 2012).

. Accordingly, the report's misleading information is sufficiently

substantial and important as to affect a reasonable consumer's decision making about the

The Commission attacks as misguided the Court's inferential method of assessing

whether the report is materially inaccurate, stressing that all the statements in the report are true.

This critique is unsound for two interrelated reasons. First, determining whether a report is

misleading requires the reader to rely on inferential reasoning. *Cf.* Deborah Jones Merritt & Ric

Simmons. Learning Evidence: From the Federal Rules to the Courtroom 16 (2009) (emphasis

added) (stating that "there is no clear line between direct and circumstantial evidence," in part

because "[o]ur brains function by gathering sense impressions, integrating those impressions into

meaningful patterns, and **drawing inferences** from those patterns"). Second, the Commission's

own regulations call on the Court step into the shoes of an ordinary consumer to determine

whether a report is materially inaccurate. *See* 16 C.F.R. § 1102.26(a)(1) (2011) (emphasis added)

(pertinently defining materially inaccurate information as that which is "so substantial and

important as to affect a **reasonable consumer's decision making** about the product").

The Commission counters that the website contains the following disclaimer: "CPSC

does not guarantee the accuracy, completeness, or adequacy of the contents of the Publicly

Available Consumer Product Safety Information Database on SaferProducts.gov, particularly

with respect to information submitted by people outside of CPSC." *See SaferProducts.gov*,

CPSC.gov, http://www.saferproducts.gov/ (last visited June 18, 2012). This disclaimer, however, is boilerplate and would not interest an ordinary consumer. Whatever calibrating or countervailing influence the disclaimer promises is insufficient to counterbalance the website's inexorable import of serving as a sanctuary for reports relating to unsafe consumer products. Besides, as Plaintiff points out, the disclaimer does not appear to be visible on all computer monitors, at least without scrolling to the bottom of the page. In fact, one of the featured images on the website's homepage shows a woman viewing a SaferProducts.gov webpage that does not display the disclaimer. *See SaferProducts.gov*, CPSC.gov, http://www.saferproducts.gov/ (last visited June 18, 2012). Furthermore, although Plaintiff could publicly comment on the report's inaccuracy, ordinary consumers would likely dismiss this measure as disingenuous damage control.

The GAO report further discredits the idea that the report lacks materially inaccurate information. To reiterate, it states that the Commission determined reports to be *materially inaccurate* where "the evidence in the report of harm did not show that the product was the source of the problem." GAO, *supra* at 15. Here, as established above, the "evidence" in the report fails to show that ▮▮▮▮▮ caused ▮▮▮▮▮▮▮ Therefore, the Commission's precedents would seem to warrant the conclusion that the contested report is materially inaccurate within the meaning of its regulations. Indeed, Defendant Tenenbaum testified before Congress that the Commission's early decisions about material inaccuracy claims would "set precedent." Pl.'s Reply Supp. Cross-Mot. Summ. J. 2 n.1, Doc. No. 48 (citing *Financial Services and General Government Appropriations for 2012: Hearing Before the H. Comm. on Approps.*, 112th Cong. 212 (2011) (statement of Inez Tenenbaum, Chairwoman, Consum. Prod. Safety Comm.)); *see also id.* at 208 (same).

49

The preceding discussion demonstrates that the disputed report is materially inaccurate within the meaning of the Commission's own regulations. Accordingly, the Commission's decision to disseminate it runs afoul of the APA.

4.    *The Commission's Residual Counterarguments*

The Court's moderately abbreviated discussion of the Commission's counterarguments reflects two considerations. First, explicitly or implicitly, the Court disarmed the vast bulk of them in the earlier exposition. Second, the few residual flickers of reasoning are futile.

The Commission contends that the phrase "relating to the use of consumer products" imposes a jurisdictional bar, not a requirement of causation or connection. *See* Def.'s Mem. Supp. Mot. Summ. J. 36–37, Doc. No. 41-1. To bolster this contention, the Commission relies heavily on the language of CPSIA § 2055a(b)(1). Pertinently, it provides: "[T]he database shall include . . . : (A) "Reports of harm relating to the use of consumer products, and other products or substances regulated by the Commission . . . ." 15 U.S.C.A. § 2055a(b)(1), (A) (West 2009). In Plaintiff's estimation, Congress's use of the phrase "other products or substances regulated by the Commission" after the phrase "reports of harm relating to the use of consumer products" shows that Congress intended the database to contain "only reports of harm relating to consumer products, as opposed to, for example, food, drugs, airplanes, or motor vehicles." Def.'s Mem. Supp. Mot. Summ. J. 36, Doc. No. 41-1.

This argument begs the question. In the Commission's own words, Congress intended the database to contain "only reports of harm **relating to** consumer products . . . ." Def.'s Mem. Supp. Mot. Summ. J. 36, Doc. No. 41-1 (emphasis added). However, as the Court's exhaustive textual examination evinced, the meaning of the phrase "relating to" is ambiguous. Accordingly, the Court proceeded to apply the *Chevron* and *Auer* frameworks and determined that the

50

Case 8:11-cv-02958-AW   Document 69 *SEALED* (Court only)   Filed 10/09/12   Page 51 of 73

Commission's construction of the CPSIA and its concomitant regulations deserved no deference. The Court continued to explicate the various ways wherein the Commission's action contravened the APA. The Commission has failed to present a compelling argument to the contrary. Properly understood, the Commission's "jurisdictional" argument is a roundabout way of arguing that the phrase "relating to" encompasses a low threshold for connection. Even if this assertion were accurate, it would fail to change the fact that the at-issue agency action transgresses the Commission's own regulations and relevant precedents. Consequently, the Commission's jurisdictional argument is unavailing.

Regarding the meaning of "relating to," the Commission consistently accuses Plaintiff of conflating causation with correlation. The salient flaw in this argument is that the incident report fails to indicate a correlation between ███████████████████████ Merriam Webster's Online Dictionary defines correlation as follows: "a relation existing between phenomena or things . . . which tend to vary, be associated, or occur together in a way not expected on the basis of chance alone." *Correlation*, Merriam Webster.com, http://www.merriam-webster.com/dictionary/correlation (last visited June 18, 2012) (emphasis added). Here, however, the Commission hangs its indictment of Plaintiff's product on the happenstance that ██████████████████████ The Commission's self-serving and unsubstantiated assertion that ████████ carry general █████████ risks is utterly insufficient to establish that ████████████ varied, occurred, or was associated with █████ ███████ in a non-coincidental manner. Quite contrarily, Plaintiff has repeatedly averred that it has sold more than ████████████████████ and has yet to receive a single complaint regarding ██████████████

The Commission assails Plaintiff's reliance on its professed stellar safety record. Specifically, the Commission accuses Plaintiff of committing the logical fallacy *post hoc, ergo propter hoc.* That is, the Commission contends that it is illogical to conclude that ███████ did not relate to ████████ because of the absence of prior similar incidents of harm. In so arguing, the Commission itself commits the logical fallacy of attacking a straw man. Properly understood, Plaintiff argues that other evidence (i.e., the epidemiologic report, ████████ ███████████████) negates the existence of a nexus between ██████████ and █ █████████ Plaintiff then touts its self-styled spotless safety record to strengthen this conclusion. Thus, the Commission's mischaracterization of Plaintiff's argument displays obliviousness to the concept of conditional probability. *See Al-Adahi v. Obama*, 613 F.3d 1102, 1105 (D.C. Cir. 2010) (citations omitted) ("Those who do not take into account conditional probability . . . [m]ay think that if a particular fact does not itself prove the ultimate proposition . . . the fact may be tossed aside and the next fact may be evaluated as if the first did not exist.").

Finally, the Commission's memoranda contain trappings of the doomsday argument that ruling against the Commission portends to produce the drastic consequence of preventing it from expeditiously publishing reports of harm in derogation of the CPSIA's remedial purposes. Standing at nearly 9,000, the substantial number of reports of harm that have been published on the database would seem to discount this possibility, especially considering the recency with which the database was established. *See SaferProducts.gov | Search Result*, CPSC.gov, http://www.saferproducts.gov/Search/Result.aspx?dm=0&max=20000&ps=50&srt=0&t=2 (last visited June 18, 2012).

Granted, this case represents the first successful legal challenge to the database. *See* Dina ElBoghdady, *CPSC Database Faces First Legal Challenge*, The Wash. Post, Oct. 18, 2011,

http://www.washingtonpost.com/business/economy/cpsc-database-faces-first-legal-challenge/2011/10/18/gIQAtpKivL_story.html. However, the Commission has given the Court no good reason to believe that these putative cases would resemble this case in relevant respects. For instance, manufacturers whose products are identified by reports of harm will not always file material inaccuracy claims. Even when they file such claims, they will not continually contest the Commission's determination that the report is fit for publication, conceivably in some cases because they concur with the Commission's correction. Nor must one presume that, unlike in this case, the Commission will stand by silent in the face of inconsistent prior action, or predicate its decision on rationales that run afoul of its own regulations. Additionally, the Commission's own regulations contemplate that reports of harm will not always meet the requirements for publication: in such cases, the Commission must maintain them for data gathering purposes. *See* 16 C.F.R. § 1102.10(h) (2011). Thus, the prospect of successful challenges to the database does not threaten to categorically compromise the Commission's consumer safety mission. In sum, there is ample middle ground between the foundation this opinion lays and the apocalypse the Commission predicts.

\*\*\*

The Commission's position that the report should be published is untenable. In violation of statutory and regulatory mandates, the report is misleading and fails to relate to Plaintiff's product in any sensible way. The Commission rejected the report three times and, on the fourth try, seeks to publish an incarnation having all the earmarks of ones erstwhile spurned. To defend this discrepancy, the Commission first revived a rationale that it had interred by refusing to publish the report's second rendition. Then, compounding the incongruence, the Commission

predicated publication on an admixture of post-hoc rationalization and speculation. Such erratic behavior, beyond being a gross abuse of discretion, emblematizes the arbitrary and capricious standard that *Chevron* and the APA embody. In short, the Commission's decision is unmoored to the CPSIA's public safety purposes and runs afoul of bedrock principles of administrative law and the sound policies that buoy them. Accordingly, beyond peradventure, Plaintiff has demonstrated that publishing the report would violate the APA.

B.   **Whether the Commission's Decision to Publish the Report Constitutes Final Agency Action**

The Commission insists that its decision does not constitute final agency action and, therefore, lacks reviewability. Albeit colorable, this argument is unconvincing and fails to overcome the strong presumption that courts may review informal agency adjudication.

The APA embraces a "strong presumption in favor of judicial review of administrative action." *INS v. St. Cyr*, 533 U.S. 289, 298 (2001). Numerous Supreme Court cases have established that "judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *See Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)). "[O]nly upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review." *Bowen*, 476 U.S. at 671–72 (citation and internal quotation marks omitted). "Accordingly, even when an enabling act is completely silent concerning the availability of judicial review over the agency action it authorizes, . . . the [APA] typically authorizes APA review." Keith Werhan, Principles of Administrative Law § 7.2, at 273 (2008) (citing *Sierra Club v. Peterson*, 185 F.3d 349, 365 (5th Cir. 1999)); *see also Bowen*, 476 U.S. at 670 (citing *Abbott Labs.*, 387 U.S. at 140).

Case 8:11-cv-02958-AW   Document 69 *SEALED* (Court only)   Filed 10/09/12   Page 55 of 73

Section 702 of the APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702 (2006). Section 702 codifies the longstanding presumption that courts may review agency action. *See Abbott Labs.*, 387 U.S. at 140. In contrast, § 704 provides that "[a]gency action made reviewable by statute and **final agency action** for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704 (2006) (emphasis added). Thus, "§ 704 limits the APA's non-statutory right of judicial review to final agency action." *Flue-Cured*, 313 F.3d at 857 (citing 5 U.S.C. § 704 (2006)); *accord, e.g., Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).

"As a general matter, two conditions must be satisfied for agency action to be 'final.'" *Bennett v. Spear*, 520 U.S. 154, 177 (1997) (emphasis added). "First, the action must mark the consummation of the agency's decisionmaking process." *Id.* at 177–78 (citation and internal quotation marks omitted). In other words, "it must not be of a merely tentative or interlocutory nature." *Id.* at 178. Second, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (citations and internal quotation marks omitted).

In this case, the Commission's decision to publish the report marked the consummation of its decisionmaking process. The process started when the Commission received the original report. Pursuant to statutory mandate, the Commission transmitted the report to Plaintiff. *See* 15 U.S.C.A. § 2055a(c)(1) (West 2009). In accordance with the Commission's associated regulations, Plaintiff filed a material inaccuracy claim. *See* 16 C.F.R. § 1102.26(a); *see also* 15 U.S.C.A. § 2055a(c)(4)(A) (West 2009) (providing that parties may notify the Commission that reports of harm are materially inaccurate). Incident to this process, Plaintiff had to "[p]rovide

55

evidence" to sustain its material inaccuracy claim, 16 C.F.R. § 1102.26 (b)(4) (2011), concerning which it "b[ore] the burden of proof." *Id.* § 1102.26 (b). *See also* AR000276 (emphasis added) (denying Plaintiff's fifth material inaccuracy claim "because [Plaintiff] failed to meet [its] burden of proof that the information in the Report is materially inaccurate."). In short, the Commission evaluated the evidence, judged it against the CPSIA and its concomitant regulations, and made a factual and legal "determination" that the report contained no materially inaccurate information. *See id.* § 1102.26(b) (emphasis added); *see also* Werhan, *supra* § 8.7, at 354 (emphasis added) ("The **final element** of agency action . . . [i]nvolves . . . the agency's application of law . . . to fact . . . ."). This determination triggered statutory and regulatory mandates to publish the report. *See* 15 U.S.C.A. § 2055a(c)(4) (West 2009); 16 C.F.R. § 1102.26(j) (2011). At this point, its decision became final.

The Commission's decision to publish the report is likewise one by which rights or obligations have been determined. "The second element of the finality requirement of section 704 . . . often goes hand-in-hand with the first element . . . ." Werhan, *supra* § 7.3, at 298. As explained in the preceding paragraph, the CPSIA and its implementing regulations obligate the Commission to publish reports of harm that it determines to be free of materially inaccurate information. Section 2055a(b)(1) sets the statutory baseline, mandating that the database shall include reports of harm. *See* 15 U.S.C.A. § 2055a(b)(1) (West 2009). The CPSIA, however, contains a set of procedures that enable manufacturers to challenge the publication of reports on material inaccuracy grounds. *See id.* § 2055a(c). Via informal adjudication, the CPSIA and its concomitant regulations require the Commission to determine whether the report is materially inaccurate. *See* 15 U.S.C.A. § 2055a(c)(4)(A) (West 2009); 16 C.F.R § 1102.26 (b). At this stage in the process, the CPSIA and its implementing regulations leave the Commission essentially just

three options: (1) publish the report because it contains no material inaccuracy; (2) decline to publish the report because it is materially inaccurate; or (3) correct the material inaccuracy and publish the report. *See* 15 U.S.C.A. § 2055a(c)(4)(A) (West 2009); 16 C.F.R. § 1102.26(g) (2011). Because it determined that the report was materially inaccurate yet correctable, the Commission took the third route. No other avenue was open to it. That is, the statutorily and regulatorily prescribed informal adjudication determined its obligation to publish the report.

The Commission argues that its decision lacks finality for the following reasons: (1) the report confers no rights or obligations on Plaintiff; (2) the report carries no legal consequences for Plaintiff; and (3) the report is a preliminary step that may lead to further fact-finding and administrative action. These arguments are meritless.

The assertion that the report confers no rights or obligations on Plaintiff misstates the second prong of the test for finality. The second prong does not require that the agency action confer rights or obligations on the plaintiff. Rather, "the action must be one by which rights or obligations have been determined . . . ." *Bennett*, 520 U.S. at 178. The Commission appears to construe this liberal language for the restrictive proposition that the decision must determine Plaintiff's rights or obligations, as opposed to the Commission's, for it to count as final. This self-serving interpretation runs counter to the literal language of *Bennett*. As enunciated in *Bennett*, an equally apposite question is whether the Commission's decision that the report is publishable determined its own rights or obligations. Of course it did. It marked the consummation of the Commission's statutory and regulatory obligation to determine, through informal adjudication, whether to publish the report. *Cf. Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) (holding that the EEOC's adoption of a policy permitting the disclosure of confidential information about the plaintiff without notice in conjunction with

Case 8:11-cv-02958-AW   Document 69 *SEALED* (Court only)   Filed 10/09/12   Page 58 of 73

FOIA requests satisfied the second prong as it determined the *agency's* obligation to disclose the information to the submitter).

The Commission's decision also determined *Plaintiff's* right to keep a materially inaccurate report regarding ▮▮▮▮ off of the database. *See* 15 U.S.C.A. § 2055a(c)(4)(A) (West 2009); 16 C.F.R. § 1102.26(g) (2011). In essence, the Commission's regulations allow it to take only two steps when it grants a material inaccuracy claim: (1) decline to publish the report or (2) correct the report and publish it. *See* 16 C.F.R. § 1102.26(g) (2011). Where, as here, the Commission takes the second step and the report still contains materially inaccurate information, such action determines Plaintiff's statutorily and regulatorily spawned right to prevent publication of the materially inaccurate information. *See* 15 U.S.C.A. § 2055a(c)(4)(A) (West 2009); 16 C.F.R § 1102.26(g) (2011). Accordingly, the Commission's action would satisfy the second prong even if *Bennett* and its progeny invariably required the challenged action to determine the plaintiff's rights instead of the agency's.

Second, the Commission argues that its decision is not final because the report carries no legal consequences for Plaintiff. Preliminarily, it bears emphasis that the *Bennett* court stated the second prong of the finality test in the disjunctive. That is, "the action must be one by which rights or obligations have been determined, **or** from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (emphasis added). Therefore, the finality vel non of agency action does not automatically turn on the presence of legal consequences to the plaintiff.

That oblivion aside, the Court further considers the Commission's "legal consequences" argument. To buttress this argument, the Commission summarizes a litany of cases, only a triad of which is binding. In the Commission's estimation.

Court after court has held that agency publications with greater substantive

content than the report at issue here—including guidelines, reports, policy

documents, classifications, and advisory opinions (each of them "final" in a

colloquial sense)—do not qualify as final agency action under the APA because

they carry no legal consequences.

Pl.'s Mem. Supp. Mot. Summ. J. 18, Doc. No. 41-1. The Court distinguishes the trinity of

controlling cases in the subsequent space. "The Court declines to distinguish the other cases [the

Commission] cite[s] because (1) they are not controlling and (2) to do so would only belabor the

point." *Chesapeake Bay Found., Inc. v. Weyerhaeuser Co.*, Civil Action No. 8:11–CV–00047–

AW, 2012 WL 987600, at *14 (D. Md. Mar. 23, 2012).

The Commission's lead case for its legal consequences argument is the Fourth Circuit's

decision in *Flue-Cured*, 313 F.3d 852. The *Flue-Cured* court held that the EPA's publication of a

comprehensive report warning of health hazards (e.g., cancer) associated with secondhand smoke

was not final agency action under the APA. *See id.* at 856–57. The EPA issued the report

pursuant to its authority under the Radon Gas and Indoor Air Quality Research Act of 1986

("Radon Act"), Pub. L. No. 99-499, §§ 401–405, 100 Stat. 1758 (1986) (reprinted in 42 U.S.C. §

7401 note). *Id.* at 856. However, while the Radon Act required the EPA to issue such reports, it

expressly stripped the EPA of any regulatory authority under it. *Id.* at 855–56. This fact figured

prominently in the Court's conclusion that publishing the report failed to qualify as final agency

action. *See id.* at 858–59. The court further reasoned that the report carried no "direct and

appreciable legal consequences." *Id.* at 859 (citations and internal quotation marks omitted).

Additionally, the court raised the specter of runaway legal challenges to federal agencies'

publication of "controversial research." *See id.* at 861.

One can readily distinguish this case from *Flue-Cured*. In this case, unlike in *Flue-Cured*, the Commission's decision to publish the report marked the consummation of an adversarial process that involved "[p]rovid[ing] evidence" with a view to meeting the "burden of proof." *See* 16 C.F.R. § 1102.26(b) (2011). This process obligated the Commission to make a "determination" that the report satisfied the requirements for publication, including the prescription against materially inaccurate information. *See id.; see also* 15 U.S.C.A. § 2055a(b)-(c) (West 2009); 16 C.F.R. § 1102.10(d) (2011). Whereas the research report in *Flue-Cured* was informational in nature, the Commission's decision was a mixed question of law and fact culminating an adjudicatory process, and hence a hallmark of final agency action. *Compare Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 655–56 (1990) (upholding agency decision "made by informal adjudication"), *with* Werhan, *supra* § 8.7, at 354 (emphasis added) ("The final element of agency action . . . [i]nvolves . . . the agency's application of law . . to fact . . . .").

Given the absence of adjudication in *Flue-Cured*, one can readily grasp the court's sharp focus on the Radon Act's stripping the EPA of regulatory authority thereunder. It is black letter law that all reviewable agency action falls into the category of rulemaking (formal or informal) or adjudication (formal or informal). *See, e.g.,* Werhan, *supra*, at 160. Therefore, the reviewability of the research report rested on whether it was a rule. The *Flue-Cured* court could not, however, properly regard the report as a rule because (1) the EPA could not enforce it and (2) it carried no direct and immediate legal consequences. *Cf. Flue-Cured*, 313 F.3d at 858–62. Although these two factors arguably apply to the instant incident report, they are inapposite inasmuch as the Commission's decision amounts to binding adjudication.

Another distinct difference between this case and *Flue-Cured* is that the Commission's decision determined the right of Plaintiff to prevent a materially inaccurate report from appearing

on the database. Dissimilarly, although the Radon Act obligated the EPA to prepare and disseminate the research report, the Act contained no provisions enabling manufacturers to contest the accuracy of research reports. *See* 313 F.3d at 855–56 & nn. 4–5. Along those lines, the Radon Act expressly enjoined the EPA from "carry[ing] out *any* regulatory program or *any* activity other than research . . . and . . . information dissemination . . . ." *Id.* at 859 (quoting Radon Act § 404, 100 Stat. at 1760). Here, by contrast, the CPSIA explicitly empowers the Commission to issue regulations necessary for its implementation. CPSIA § 3, 122 Stat. at 3017. In sum, as this case involves a statute spawning a regulatory scheme by which the Commission determines statutorily created rights. *Flue-Cured* is inapposite.

One cannot understate the difference between the research report in *Flue-Cured* and the instant report. Although thorough, the research report is tantamount to a general warning about the dangers of secondhand smoke. *Flue-Cured* fails to indicate that the research report specifically targeted the plaintiff tobacco companies or their particular products. Similarly, *Flue-Cured* leaves no suggestion that the research report linked particular tobacco products to specific injuries and/or deaths. *See, e.g.*, 313 F.3d at 856 (noting the research report's general finding that secondhand smoke "is annually responsible for approximately 3,000 nonsmoker, lung cancer . . . deaths"). Such characteristics stand in stark contrast to the incident report which, via a virtual vehicle devoted to revealing venturesome consumer vendibles, indicts Plaintiff's product by innuendo. In short, whereas the research report was generalized and informational in nature, the incident report is individualized and accusatory. *See generally* Werhan, *supra* § 3.1 (discussing the distinction between rulemaking and adjudication).

Contrary to the policy concerns the *Flue-Cured* court expressed, ruling for Plaintiff does not portend to open a Pandora's box. The Commission raises a related argument, asserting that

"Plaintiff's theory would lead to the absurd result that final agency action occurs every time an agency completes the last step . . . in a multi-step administrative process." Def.'s Reply Supp. Mot. Summ. J. 4 n.3, Doc. No. 47. This case, however, entails much more than the publication of "controversial research" or "multi-step administrative processes." To reiterate, the Commission's decision perfected an adversarial process involving the submission of evidence and a legal determination that Plaintiff failed to carry the burden of proof and that the report otherwise satisfied the statutory and regulatory preconditions for publication. These conditions are not present whenever the government plans to publish controversial research or completes a multistep administrative process. This argument also overlooks the fact that the Commission's decision determined the Commission's right to prevent publication of the misleading and detrimental data. The earlier exposition likewise elucidates the improvidence of prophesying that ruling for Plaintiff will usher in administrative Armageddon. Notably, whereas the Commission has published nearly 9,000 reports of harm on the database, this case appears to be its first legal challenge. The Commission does not explain how one successful challenge threatens to swing open the floodgates of litigation, thereby manacling the Commission's mandate to verse the public of venturesome vendibles. In a nutshell, the policy concerns the *Flue-Cured* court raised are inapposite, and Plaintiff's dire predictions concerning the future fitness of the database are improvident.

The Commission likewise misplaces reliance on *Invention Submission Corp. v. Rogan*, 357 F.3d 452 (4th Cir. 2004). In *Invention Submission*, the Fourth Circuit held that the United States Patent and Trademark Office's ("PTO") decision to publish advertisements alerting the public of "invention promotion scams" was not final agency action. *Id.* at 454. The PTO published such ads pursuant to a regulation authorizing it to "provide a forum for the publication

of complaints concerning invention promoters." *Id.* at 454 (quoting 37 C.F.R. § 4.1 (2011)); *see also* 35 U.S.C. § 297(b) (2006) (authorizing civil actions against fraudulent invention promoters). A journalist saw an ad mentioning a man (Lewis) who claimed to have been the victim of a scam and contacted him. *Id.* at 455. Lewis accused Invention Submission of having perpetrated the scam and the journalist published a story relating Lewis's accusations. *See id.*

Invention Submission sued the PTO under the APA and, after the PTO moved to dismiss, the district court dismissed its action under Rule 12(b)(6). *See id.* at 455–57. In dismissing the action, the district court reasoned that "[t]he PTO's publications . . . were merely generic advertisements . . . not specifically naming the plaintiff." *Id.* at 457. The *Invention Submission* court concluded that the challenged action was not final on similar grounds. *See id.* at 459–60. However, as the lack of final agency action deprived the district court of subject matter jurisdiction, the court vacated and remanded with instructions to dismiss the case under Rule 12(b)(1). *Id.* at 460.

The material differences between this case and *Invention Submission* are manifest. Dissimilar to this case, the relevant statutes and regulations in *Invention Submission* featured no adjudicatory procedures governing the submission of material inaccuracy claims. Contrastedly, 35 U.S.C. § 297(b) creates a private right of action against perpetrators of fraudulent invention promotions. *See* 35 U.S.C. § 297(b) (2006). Furthermore, unlike the generic advertisement in *Invention Submission*, the incident report specifically names Plaintiff's product. For these reasons alone, *Invention Submission* is inapposite.

The Commission pins its final hope on *Golden and Zimmerman, LLC v. Domenech*, 599 F.3d 426 (4th Cir. 2010). The *Domenech* court held that the ATF's publication of a reference guideline designed to help gun dealers comply with the Gun Control Act, 18 U.S.C. §§ 921 *et*

*seq.*, was not final agency action. *Id.* at 428. In so holding, the court stressed that the relevant interpretation from the reference guide simply restated a longstanding interpretation of the Gun Control Act. *See id.* at 432. The court further reasoned that the interpretation "d[id] not itself *determine* the law." *Id.* at 433.

Mirroring the other Fourth Circuit cases that the Commission cites, *Domenech* does not involve informal adjudication incident to a statutory and regulatory scheme. Whereas the reference guide interpretation "d[id] not itself *determine* the law," the Commission's decision required it to resolve disputed facts, weigh evidence, and make a legal "determination" that the report was free of materially inaccurate information and otherwise publishable. *See* 16 C.F.R. § 1102.26(b) (2011). Therefore, dissimilar to *Domenech*, the Commission's decision was a legal determination insofar as it necessitated the application of positive law to a particularized set of facts ironed out through an adversarial process. *See* Werhan, *supra* § 8.7, at 354 (emphasis added) ("The **final element** of agency action . . . [i]nvolves . . . the agency's application of law . . . to fact . . . ."); *cf.* Black's Law Dictionary (9th ed. 2009) (defining "mixed question of law and fact" as "[a]n issue that is neither a pure question of fact nor a pure question of law"). Hence, as with the other Fourth Circuit cases distinguished above, *Domenech* is inapposite.

The Commission's third, and final, argument is that the report is a preliminary step that may lead to further fact-finding and administrative action. This is the Commission's way of saying that its decision is "of a merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 177. The Commission sets forth this argument in greater detail:

> Based on the information published in the Database and from other sources, the
> CPSC could subsequently engage in fact-finding and administrative procedures
> resulting in agency action that **may** ultimately affect Plaintiff's rights or

obligations. For instance, the CPSC **could** promulgate a rule specifying

performance or labeling and instruction requirements, or **could** ban a product

from the marketplace. *See* 15 U.S.C. §§ 2056, 2057, 2058. Or, should the CPSC

determine that a product presents a substantial product hazard, it **may** order the

manufacturer to notify the public and to conduct a recall. 15 U.S.C. § 2064(c), (d).

Short of taking such actions, however, the CPSC will have engaged in only

preliminary steps, not final agency action.

Def.'s Mem. Supp. Mot. Summ. J. 25–26, Doc. No. 41-1 (emphases added).

Although the Court generally agrees with the Commission's assessment of the CPSIA's

sibling statute, the CPSA, it does not follow that the Commission's publication decision is

tentative or interlocutory in nature. In essence, the Commission's argument is a red herring. The

Commission's requirement to publish the report stems from the CPSIA, not the CPSA. *See* 15

U.S.C.A. § 2055a(b)(1) (West 2009); *id.* § 2055a(c)(4); *see also* 16 C.F.R. § 1102.26(g), (j)

(2011). In other words, publication of the report is the last step in the decision-making process

that the CPSIA and its implementing regulations set in motion. Furthermore, the Commission's

repeated use of the words "may" and "could" demonstrate that it has no serious design on taking

future action in connection with the report. *See* Def.'s Mem. Supp. Mot. Summ. J. 25–26, Doc.

No. 41-1. Indeed, during oral argument, the Court expressed concern that the Commission's

decision "could never be final" and the Commission conceded that "[t]hat may be." Oral Arg. Tr.

29:20–21, Doc. No. 44. Additionally, the Commission fails to explain how the cited CPSA

provision would enable it to override its decision that the report of harm relates to ██████████

████████ or whether the Commission would even entertain this possibility. In any event, the

remote possibility of future action tangentially related to an ostensibly final decision is

insufficient to vitiate the finality of the same. The Supreme Court recently held as much. *See Sackett v. EPA*, 132 S. Ct. 1367, 1372 (2012) ("The mere possibility that an agency might reconsider . . . does not suffice to make an otherwise final agency action nonfinal.").

The preceding discussion demonstrates that the Commission's decision to publish the report of harm constitutes final agency action under the APA. Therefore, having held that the Commission's decision is arbitrary and capricious and an abuse of discretion under the APA, the Court grants Plaintiff's Cross-Motion for Summary Judgment and permanently enjoins publication of the report. In light of this disposition, the Court declines to address Plaintiff's alternative Fifth Amendment due process and takings arguments. *See Flue-Cured*, 313 F.3d at 857 (quoting *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)) ("It is not the habit of the Court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.").

**C.    Whether It Is Proper to Grant Plaintiff's Motion to Seal**

In its Motion to Seal, Plaintiff requests the Court to take two principal actions: (1) seal the entire case[9]; and (2) permit it to proceed under the pseudonym Company Doe. The Court's prior determination that the report is materially inaccurate and injurious to Plaintiff's reputation informs its resolution of this Motion.

*1.    Whether to Seal the Entire Case*

"The right of public access to documents or materials filed in a district court derives from two independent sources: the common law and the First Amendment." *Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 575 (4th Cir. 2004) (citing *Stone v. Univ. of Md. Med. Sys. Corp.*,

---

[9] By sealing the entire case, Plaintiff basically means (1) sealing access the public docket (except its Motion to Seal and concomitant memorandum in support) and (2) requiring all files to be filed under super seal. Super seal essentially means that, beyond being sealed, the filed documents create docket entries only on the sealed docket. In other words, people with access to the public docket cannot see that the super-sealed documents have been filed.

855 F.2d 178, 180 (4th Cir. 1988)). "The distinction between the rights of access afforded by the common law and the First Amendment is 'significant' . . . ." *Id.* (quoting *In re Balt. Sun Co.*, 886 F.2d 60, 64 (4th Cir. 1989)). For "the common law 'does not afford as much substantive protection to the interests of the press and the public as does the First Amendment.'" *Id.* (quoting *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988)). "Consequently, 'the common law does not provide as much access to the press and public as does the First Amendment.'" *Id.* (quoting *In re State–Record Co.*, 917 F.2d 124, 127 (4th Cir. 1990)).

"The common law presumes a right of the public to inspect and copy 'all judicial records and documents.'" *Id.* (some internal quotation marks omitted) (quoting *Stone*, 855 F.2d at 180). "'This presumption of access, however, can be rebutted if countervailing interests heavily outweigh the public interests in access,' and '[t]he party seeking to overcome the presumption bears the burden of showing some significant interest that outweighs the presumption.'" *Id.* (alteration in original) (quoting *Rushford*, 846 F.2d at 253). "Ultimately, under the common law the decision whether to grant or restrict access to judicial records or documents is a matter of a district court's 'supervisory power,' and it is one 'best left to the sound discretion of the [district] court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case.'" *Id.* (alteration in original) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598–99 (1978)). Therefore, appellate courts "review a district court's decision concerning common law access for abuse of discretion." *Id.* (citing *Rushford*, 846 F.2d at 253).

"In contrast to the common law, 'the First Amendment guarantee of access has been extended only to particular judicial records and documents.'" *Id.* at 576 (quoting *Stone*, 855 F.2d at 180). "When presented with a request to seal judicial records or documents, a district court must comply with certain substantive and procedural requirements." *Id.* (citing *Rushford*, 846

F.2d at 253). "As to the substance, the district court first 'must determine the source of the right of access with respect to each document,' because '[o]nly then can it accurately weigh the competing interests at stake.'" *Id.* (alteration in original) (quoting *Stone*, 855 F.2d at 181).

The procedural requirements *Stone* sets forth are similarly involved. The *Washington Post* court states them succinctly:

> [The district court] must give the public notice of the request to seal and a reasonable opportunity to challenge the request; it must consider less drastic alternatives to sealing; and if it decides to seal it must state the reasons (and specific supporting findings) for its decision and the reasons for rejecting alternatives to sealing.

*Wash. Post*, 386 F.3d at 576 (citing *Stone*, 855 F.2d at 181). "Adherence to this procedure serves to ensure that the decision to seal materials will not be made lightly and that it will be subject to meaningful appellate review." *Id.* (citing *Stone*, 855 F.2d at 182). Unsurprisingly, such a record-specific determination "'is one properly made in the first instance from the superior vantage point of the district court.'" *Id.* (quoting *Stone*, 855 F.2d at 182).

Mindful of these principles, the Court tentatively grants Plaintiff's Motion to Seal. Although the law favors access to judicial records, the facts of this case overcome this presumption. The challenged report is materially inaccurate, injurious to Plaintiff's reputation, and risks harm to Plaintiff's economic interests. To obviate such harm, Plaintiff sought, and successfully obtained, an injunction evermore enjoining the report's publication. However, were the Court to unqualifiedly unseal the case, Plaintiff would sacrifice the same right it sought to safeguard by filing suit. Both the Commission and the Consumer Groups have failed to identify interests sufficiently important to justify such an anomalous outcome.

Case 8:11-cv-02958-AW   Document 69 *SEALED* (Court only)   Filed 10/09/12   Page 69 of 73

The arguments the Commission and the Consumer Groups mount to oppose Plaintiff's Motion to Seal are virtually identical. These overlapping arguments share an overarching flaw: they presume that the public has an interest in the subject matter of this suit. The CPSIA, however, contemplates publication of reports that, at a categorical minimum, show some semblance of promise to promote public safety. The incident report flunks this test for a myriad of reasons, not the least of which is that the harm the report describes bears no sensible relation to ███████████████ Although the jury is still out on ████████, the available evidence indicates that it has a solid track record of safety. *See* ████ Decl. ¶ 9, Doc. No. 9-9. Although one might dub ████████'s declarations as self-serving, the Commission does not dispute his assertion that Plaintiff has received no similar complaints apropos of ████████ These considerations compel the conclusion that, at the very least, the documents in this case warrant some baseline level of protection.

All the same, the remedy of sealing the entire case seems overbroad. The First Amendment guarantee of access likely applies to some of the documents that Plaintiff seeks to seal (e.g., memoranda relating to dispositive motions). *See Stone*, 855 F.2d at 180–81 (citations omitted). This guarantee attaches equally, and maybe more forcefully, to the instant Memorandum Opinion. *See id.* at 180. This Court does not customarily sit as a Star Chamber, resolving of cases under the veil of a virtual seal. Even though the Commission (i.e., the government) is aware of this case's outcome, the Court agrees that the public has some residual interest in knowing how courts have construed the CPSIA, especially since this case marks its first legal challenge. Presumably, one can satisfy this interest by—however heavily—redacting key documents. The Court will also publish a—however heavily—redacted version of this Opinion. Generally, this measure strikes a balance between the public's abstract interest in

learning of the CPSIA's interpretive fate with Plaintiff's comparably concrete interest in preserving its reputational and fiscal health.

This is not to suggest, however, that targeted redaction will rectify the wholesale unsealing of all records in the case. Many of the documents likely enjoy no First Amendment protection. The less demanding common law right of access would apply to these documents. Furthermore, irrespective of the applicable standard, it is unclear that one can redact certain records so as to prevent the public from linking Plaintiff to the report of harm or related events. Presumably, Plaintiff is in the best position to determine what level of redaction, if any, will suffice to balance the competing interests. If no level of redaction proves adequate to shield Plaintiff's interests, it is exceedingly unlikely that the Court will unseal the offending documents. Acting otherwise would reduce *Plaintiff's* First Amendment interest in petitioning the Court for redress of its grievances to a Hobson's choice, a figurative fork that would fly in the face of fundamental notions of fairness.

For the foregoing reasons, following the procedures set forth in *Washington Post*, the Court orders Plaintiff to propose redactions to all the records, documents, and/or evidence in this case, including this Memorandum Opinion. Such redactions shall be no greater than necessary to protect the rights Plaintiff sought to vindicate by coming to court. If Plaintiff determines that it cannot redact a particular record item/s without compromising its vindicated interests, Plaintiff must, minding the procedures set forth in *Washington Post*, explain wherein satisfactory redaction is impracticable or otherwise improper. The Court directs Plaintiff to pay particular care not to overredact the instant Opinion, as it is ostensibly the most important record for the public to access. The Commission is free to comment on Plaintiff's proposed redactions, considering that the Court has prognosticated the propriety of heavy redactions. Plaintiff may

Case 8:11-cv-02958-AW   Document 69 *SEALED* (Court only)   Filed 10/09/12   Page 71 of 73

reply to any comments the Commission should choose to make. Although the Court will eventually order the Clerk to the Court to transmit this Opinion to the Consumer Groups, this transmission will not transpire until the Opinion has been appropriately redacted.

2.      *Whether to Permit Plaintiff to Proceed Anonymously*

"The decision whether to permit parties to proceed anonymously at trial is one of many involving management of the trial process that for obvious reasons are committed in the first instance to trial court discretion." *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993). "This implies, among other things, that though the general presumption of openness of judicial proceedings applies to party anonymity as a limited form of closure . . . , it operates only as a presumption and not as an absolute, unreviewable license to deny." *Id.* (citation omitted). "The rule rather is that under appropriate circumstances anonymity may, as a matter of discretion, be permitted." *Id.* Therefore, the courts of appeals review district courts' decision to permit parties to proceed anonymously for an abuse of discretion. *Id.*

As with most matters of discretion, there is no bright-line test to assess the propriety of allowing a party to proceed under a pseudonym. *See id.* Therefore, as when deciding whether to seal judicial records, courts properly make this determination "'in light of the relevant facts and circumstances of the particular case.'" *Compare Wash. Post*, 386 F.3d at 575 (quoting *Warner Commc'ns*, 435 U.S. at 598–99), *with Jacobson*, 6 F.3d at 238. The following two factors, while certainly not dispositive, factor into this determination: (1) the prejudice precluding the party from proceeding pseudonymously portends to produce, *cf. Jacobson*, 6 F.3d at 238; and (2) "the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously." *Id.*

71

These two factors weigh heavily in Plaintiff's favor. The Court has already explicated in great detail how publishing the report and unsealing the case would harm Plaintiff. The Court has likewise elucidated wherein enjoining publication of the report and keeping the case under seal risks no unfairness to the Commission. The Court declines to repeat these arguments here lest it go on ad nauseam. The Commission and Consumer Groups would fault the Court for not applying the other factors that the *Jacobson* court proclaimed. *See* 6 F.3d at 238–39. Yet the *Jacobson* court made clear that there is no hard-and-fast rule for determining the propriety of permitting a party to proceed under a pseudonym. *See id.* at 238. The *Jacobson* court further noted that the enumerated factors "ha[d] relevance to th[at] case," implying that they may lack relevance to other cases. *See id.* For instance, one of the *Jacobson* factors concerns "the **ages** of the persons whose privacy interests are sought to be protected." *Id.* (emphasis added). It goes without saying that this factor is impertinent to this case. Indeed, the Consumer Groups concede that the *Jacobson* factors are "non-exhaustive." Object. Mot. Seal 17, Doc. No. 14. Like a square peg in a round hole, the *Jacobson* factors do not readily graft onto this case, and the Court refuses to force them to fit. To do so would be to manufacture a miscarriage of justice.

*Jacobson* is also inapposite because the plaintiffs did not initiate the underlying action to prevent disclosure of their identity. Rather, they sued a doctor for medical malpractice and appealed an interlocutory order denying their motion to proceed under a pseudonym. *See Jacobson*, 6 F.3d at 234. They sought to proceed pseudonymously based on allegations that the defendant infertility doctor fraudulently used his own sperm to impregnate the plaintiff mother. *Id.* at 235. Specifically, the plaintiffs feared that the litigation might cause their children to learn that the defendant father was not their biological father. *Id.* Therefore, forbidding them to go forward under a pseudonym would not force them to forfeit the rights they sought to fend by

filing their medical malpractice and fraud action. That scenario stands in stark contrast to the

instant situation, in which the revelation of Plaintiff's identity would yield the very injury that is

the cynosure of the underlying litigation. For this added reason, *Jacobson* is all the more

inapposite.

The preceding discussion demonstrates two propositions: (1) it is proper to retain

Plaintiff's documents under super seal subject to the directives of this Memorandum Opinion and

accompanying Order; and (2) it is proper to permit Plaintiff to proceed under the pseudonym

Company Doe. Accordingly, the Court grants in part Plaintiff's Motion to Seal.

## IV.   CONCLUSION

For the foregoing reasons, the Court issues the ensuing rulings: (1) the Court **GRANTS**

**IN PART** Plaintiff's Motion to Seal; (2) **DENIES AS MOOT** Plaintiff's Motion for Preliminary

Injunction; (3) **GRANTS**, nunc pro tunc, Plaintiff's Motion for Oral Argument; (4) **DENIES** the

Consumer Groups' Motion to Unseal Filings; (5) **DENIES** the Commission's Motion for

Summary Judgment; and (6) **GRANTS** Plaintiff's Cross-Motion for Summary Judgment. A

separate Order follows containing instructions on how the Parties should proceed in light of this

Memorandum Opinion. The Order also closes the case with prejudice.

| | |
|---|---|
| _July 31, 2012_ | _/s/_ |
| Date | Alexander Williams, Jr.<br>United States District Judge |